STATE OF NORTH CAROLINA v. DAVID J. BROWN

No. 30A81

(Filed 13 July 1982)

1. **Constitutional Law § 30— defendant not entitled to view crime scene**

   Unlike Rule 16 of the Federal Rules of Criminal Procedure, G.S. 15A-903 does not specifically confer the right to "discover buildings or places." Therefore, under G.S. 15A-903(d) defendant was not entitled to inspect the crime scene.

2. **Constitutional Law § 30— discovery—denial of motion to view crime scene—denial of due process—harmless beyond reasonable doubt**

   On the facts of a prosecution for first degree murder, it was a denial of fundamental fairness and due process for defendant to be denied, under police prosecutorial supervision, a limited inspection of the premises of the crime scene in order to search for exculpatory evidence. However, because the evidence of defendant's guilt was overwhelming, the error was harmless beyond a reasonable doubt.

3. **Constitutional Law § 30; Bills of Discovery § 6— motion to inspect pretrial written statements denied—in camera inspection—placing statements in sealed envelopes**

   In a prosecution for first degree murder in which four witnesses testified that a ring found in one victim's body belonged to defendant, the trial court did not err in denying defendant's request for copies of the statements which each witness had given to the police and in reviewing the statements *in camera* and then placing the statements in a sealed envelope pursuant to the procedure enunciated in *State v. Hardy*, 293 N.C. 105 (1977). Nor did the court err in denying defendant's motion to inspect "any statements written whether in longhand or otherwise" since this request was obviously a shotgun tactic and the record disclosed no evidence of any other statements which were available to the court to inspect and seal.

4. **Constitutional Law § 30— statement of witness not revealed to defendant—no abuse of discretion**

   The trial court did not err in failing to exclude a witness's statement pursuant to G.S. 15A-910 or in denying defendant's motions for a dismissal, a mistrial, and a continuance on the grounds that the defendant had not been provided with information concerning the witness's statement since the record revealed that (1) the district attorney was not aware of the information until trial, (2) the defense counsel became aware of the information a week before trial and had, in fact, talked with the witness, and (3) the witness testified before the jury and the jury heard a full account of what he had observed on the evening of the crime.

5. **Criminal Law § 157.2— answers of witness not in record—no prejudicial error by court**

   In a prosecution for first degree murder where one of the witnesses was asked by defendant if he determined that "one or more persons" may have

State v. Brown

seen the victim after 1:00 a.m. on the night of the murder and the witness answered yes, and the trial court sustained the State's objections to questions seeking the names of the persons, the trial court erred in not allowing the defendant to have the questions answered for the record, but the error was not prejudicial since another witness testified that he had seen the victim alive at 12:30 or 1:00 a.m. on the night in question.

**6. Searches and Seizures § 14— consent to search given voluntarily and free from coercion**

In a prosecution for first degree murder, the evidence fully supported the trial court's conclusion that defendant's consent to the search of his home was voluntarily given free from coercion in any form where the evidence tended to show that two SBI agents talked with defendant about the alleged murders and informed him that they wanted to search his apartment; that they read defendant a "Consent to Search" form; that defendant signed the consent form in the presence of two police officers and a friend of defendant's with whom he had consulted; that defendant stated that he understood the form and understood his rights; that defendant was not under any influence of alcohol or drugs; and that no force or coercion was used against him or any promises made to him.

**7. Searches and Seizures § 13— obtaining search warrant does not negate prior consent to search**

Where the State obtained a search warrant subsequent to obtaining defendant's consent to search his apartment, the obtaining of the warrant did not negate the consent originally given.

**8. Jury § 6— denial of individual voir dire**

Defendant's contention that in a capital case, an individual voir dire of the jury should be allowed in order for defendant to receive a fair trial was overruled.

**9. Jury § 7.13— two capital offenses—no additional peremptory challenges**

A defendant charged with two capital offenses should not be given additional peremptory challenges.

**10. Criminal Law §§ 21.1, 22— remand after arraignment—absence of preliminary hearing**

Defendant's arraignment was not illegal because the proceedings were remanded for findings of fact by the district court concerning the reasons for the continuance of his probable cause hearing, and defendant's rights were not violated by the elimination of the probable cause hearing because of an imminent indictment.

**11. Homicide § 18— first degree murder—elements of premeditation and deliberation correctly submitted to jury**

In a prosecution for first degree murder, the nature and number of the victims' wounds were one circumstance from which inference of premeditation and deliberation could be drawn; however, evidence of the premeditation and deliberation required to sustain defendant's conviction was supplied by many other instances of circumstantial evidence.

State v. Brown

**12. Criminal Law § 111— failure to submit charge to jury in writing—no error**

In a prosecution for first degree murder, the trial court did not err by failing to submit its charge to the jury in writing as requested by defendant.

**13. Criminal Law § 114.3— judge's referring to defendant as "the defendant"—no expression of opinion**

The trial court did not impermissibly express its opinion by refusing to grant the defendant's request that he be referred to by his name and not as "the defendant."

**14. Criminal Law § 117— failure to charge jury on issue of defendant's good character—no error**

Where the defendant did not introduce character evidence, but only offered several witnesses' personal opinions of the defendant, the trial court did not err in failing to charge the jury on the issue of his good character.

**15. Constitutional Law § 31— indigent defendant—appointment of polygraph examiner**

There was no abuse of discretion in the denial of the defendant's request for the appointment of a polygraph examiner.

**16. Constitutional Law § 30— no provision for discovery of criminal records of State's witnesses**

G.S. 15A-903 does not provide for discovery of the criminal records of the State's witnesses.

**17. Criminal Law § 135.4— sentencing phase—submission of aggravating circumstance of "especially heinous, atrocious and cruel"—basis in State's proof of first degree murder**

In a prosecution for first degree murder in which defendant was tried and convicted on the basis of premeditation and deliberation, the trial court did not err in submitting the aggravating circumstance that the murders were "especially heinous, atrocious and cruel" under G.S. § 15A-2000(e)(9) where the facts underlying the State's theory of the case were also the elements used to support the submission of this aggravating circumstance.

**18. Criminal Law § 135.4— sentencing phase—submission of aggravating circumstance of "especially heinous, atrocious and cruel"—doubt that wounds inflicted before death of victims**

In a prosecution for first degree murder, the trial court did not err in submitting the aggravating circumstance that the murders were especially heinous, atrocious and cruel on the basis that the evidence did not support the conclusion beyond a reasonable doubt that the wounds inflicted were administered before the death of the victims. There was abundant evidence that many of the wounds were inflicted prior to death, and the character and severity of the wounds supported the submission of this aggravating circumstance.

19. **Criminal Law § 135.4— sentencing phase—refusal to submit requested mitigating circumstances—no error**

The trial court did not err in refusing to submit mitigating circumstances that (1) the defendant did not act in a calculated manner, (2) the defendant did not act for pecuniary gain, and (3) the defendant was under the influence of mental or emotional disturbance. Evidence that a bloody knife was found in the victim's apartment which was the same type as the knives in defendant's tool box, was evidence from which the jury could have inferred that defendant acted in a calculated manner. Even assuming the evidence showed that defendant did not act for pecuniary gain, the evidence merely showed the absence of an aggravating circumstance and not the presence of a mitigating one. Defendant's use of alcohol and drugs was properly submitted under the mitigating circumstance of G.S. 15A-2000(f)(6), impaired capacity, and not under G.S. 15A-2000(f)(2), mental or emotional disturbance.

20. **Criminal Law § 135.4— sentencing phase—testimony relating to guilt or innocence not presented at guilt phase of trial—admissible**

Testimony by a fellow prisoner that defendant told the prisoner that he had murdered two people using a knife and that he did not understand why his ring was not given back to him, was admissible at the sentencing phase of defendant's trial even though it had not been presented during the guilt determination phase of the case since it was relevant and had probative value, and since the evidence was relevant to rebut evidence submitted by the defendant at the guilt phase of the trial which would support mitigating circumstances.

21. **Criminal Law § 135.4— sentencing phase—refusal to allow questioning of district attorney concerning promises made by State to witness—proper**

The trial court did not err in the sentencing phase of a trial for first degree murder by refusing to allow defendant to question the assistant district attorney on voir dire concerning promises made by the State to the witness who testified only at the sentencing phase. The appropriate avenue of inquiry into the bias of a witness is to ask the witness himself.

22. **Criminal Law § 135.4— sentencing phase—inquiry from jury concerning chances for parole from life sentence—response from court correct**

In the sentencing phase of a trial for first degree murder, where the jury, after some deliberation, inquired of the court concerning the chances for parole from the life sentence and the court instructed the jury that "the question of eligibility for parole is not a proper matter for you to consider in recommending punishment," the court tendered an instruction which was correct and in accordance with the instructions previously approved by this Court. The trial court was not required to instruct the jury in the precise words requested by the defendant.

23. **Criminal Law § 135.4— sentencing phase—each of two killings as aggravating circumstance for the other—no violation of double jeopardy**

The trial court's submission of each of the two killings for which defendant had been tried as an aggravating circumstance for the other under the "course of conduct" provision of G.S. 15A-2000(e)(11) did not violate double jeopardy.

State v. Brown

24. **Criminal Law § 135.4— sentencing phase—failure to list all aggravating circumstances upon which State relied in response to defendant's motion for bill of particulars**

The trial court did not commit prejudicial error by submitting an aggravating circumstance which was not listed by the State in its response to defendant's motion for a bill of particulars since the trial court's order merely required the State to disclose those aggravating circumstances which it knew it intended to use at the time it responded to the motion for the bill of particulars. G.S. 15A-925(b).

25. **Criminal Law § 135.4— sentencing phase—aggravating circumstances outweighing mitigating circumstances—instruction that death must be recommended**

The trial court did not err in instructing the jury that it *must* recommend that defendant be sentenced to death if it found that the aggravating circumstances outweighed the mitigating circumstances.

26. **Criminal Law § 135.4— no instruction on inability of jury to agree on sentence—proper**

The trial court did not err in denying defendant's request to charge that a sentence of life imprisonment would be imposed in the event that the jury failed to reach a unanimous agreement on the proper sentence.

27. **Criminal Law § 135.4— Court's review of record in capital case—imposition of death not disproportionate or excessive**

Upon reviewing the record as required by G.S. 15A-2000(d)(2), the Court concluded that the sentence of death imposed was not disproportionate or excessive considering both the crime and the defendant.

Justice EXUM dissenting as to sentence.

BEFORE *Rousseau, Judge,* at the 8 December 1980 Criminal Session of Superior Court, UNION County.

Defendant was charged in indictments, proper in form, with the murders of Christina S. Chalflinch and Shelly Diane Chalflinch. Due to pretrial publicity, the trial court ordered the trial moved from Moore County, where the crimes occurred, to Union County. The jury found defendant guilty of the two counts of first degree murder and recommended that defendant be sentenced to death for both convictions. Based on the jury's recommendation, the trial court imposed a death sentence for each conviction. Defendant appeals to this Court as a matter of right.

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General Issac T. Avery III, for the State.*

*James R. Van Camp and Douglas R. Gill, for the defendant.*

CARLTON, Justice.

Defendant brings forth several assignments of error in the guilt determination phase of his trial and several alleged errors relating to the sentencing phase of his trial. After a careful consideration of these assignments, as well as the entire record before us, we find no prejudicial error in any of these proceedings and affirm his convictions and the sentences imposed.

## I.

At trial, evidence for the State tended to show that Shelly Diane Chalflinch, aged twenty-six, and her daughter, Christina S. Chalflinch, aged nine, resided in apartment 9 of the Marriage Quarters behind the Pinehurst Hotel in Pinehurst, North Carolina. They visited with Ms. Chalflinch's father, G. W. Frye, in Aberdeen on Sunday, 24 August 1980. Mr. Frye never saw his daughter or granddaughter alive after that evening.

On the morning of Tuesday, 26 August 1980, the bodies of Ms. Chalflinch and her daughter were found in a mutilated condition in the Chalflinch apartment. Police officers who entered the apartment saw blood on the floors and walls of the apartment. Pieces of flesh were scattered throughout the living area of the apartment. Small pieces of furniture had been overturned and several chairs were broken. It was hot in the apartment and the bodies had already begun to decompose. Ms. Chalflinch's body had been mutilated beyond recognition, and several feet of her intestines protruded from a large wound to her abdomen. Christina's body also bore multiple stab wounds and a brown electrical cord had been wrapped around her neck.

A bloody knife blade, broken at both ends, with the inscription "R. H. Forschne," was found in the apartment.

Following the initial investigation, the apartment was secured and remained padlocked until the time of trial. Sergeant Don Davis of the Pinehurst Police Department was placed in charge of the investigation and kept the only key to the apartment.

The bodies of the Chalflinches were taken to Chapel Hill on 26 August 1980 where autopsies were performed. An autopsy performed on the body of Ms. Chalflinch revealed approximately 100 stab and cut wounds all over her body. At least 20 of these wounds were to the facial area, 12 were in the neck area, and 16 stab wounds on the right arm appeared to be defensive in nature. In addition to the numerous wounds to the chest and shoulder area, a large gaping cut extended down the left leg from buttock to ankle and a V-shaped penetrating stab wound in the vaginal and rectal area created a virtual hole in the body. The medical examiner found a ring under the edge of the liver in the abdominal cavity. The pathologist who performed the autopsy testified, "I could place my own hand and arm through the wound in her genital area up to the area where the ring was." The ring was silver in color and had a large rectangular surface with a heraldic pattern with two animals on each side and two shields and a crown on top. In the pathologist's opinion, Ms. Chalflinch died as a result of "a combination of stab and incised wounds to all parts of her body, that some wounds might possibly have been inflicted after death and that, given the condition of the body and the temperature of the Chalflinch apartment, death could have occurred on Monday night, 25 August."

An autopsy performed on the body of Christina Chalflinch revealed multiple stab wounds, slashes, puncture marks and extensive mutilation of the genital area with a portion of the tissue removed. The head had a large number of stab wounds, one of which extended through the brain from right to left. The electrical cord which had been wrapped around the neck left a faint bluish mark. Four wounds in the chest area penetrated into the tissues of the chest and abdomen. Seven of the multiple stab wounds in the abdominal region penetrated internal organs. In the pathologist's opinion, Christina Chalflinch died as a result of multiple stab wounds to the head, chest and abdomen.

On 28 August 1980 SBI Agent Wade Anders obtained permission from the defendant to search his home, apartment 4 at the Marriage Quarters complex. Defendant was asked to sign a form indicating his consent to a search of his apartment. He signed the form after it was read to him and after he talked with a friend. The form was signed at 5:21 p.m. on 28 August 1980. The apartment was searched that same evening, while defendant was pres-

ent. Items seized during the search included the tool box in which defendant kept his kitchen equipment for his job as a cook at the Pinehurst Hotel. In the box were knives bearing the inscription "R. H. Forschner" on the blades.

A forensic serologist with the SBI examined the apartment of Ms. Chalflinch and the area outside it on 28 August 1980. He observed blood all over the apartment. Additionally, he performed luminol and phenolphthalein tests to determine the presence of blood undetectable to the human eye. Through use of these tests, blood was discovered in the corner of the kitchen in the shape of two partial footprints of the balls and toes of the feet, side by side. Patterns of blood were discovered outside the front door of Ms. Chalflinch's apartment and also on the deck outside the front door, on the fourth and tenth steps leading down from her apartment, and on the concrete pad at the foot of the steps. Blood was also observed between the concrete pad and the first stepping stone, and this bloodstain was in a shape resembling a bare foot. At the door to defendant's apartment, visible bloodstains were found on the concrete stoop. The luminol test indicated the presence of blood on the doorknob. The tool box taken from defendant's apartment had a small spot on the lid which tests revealed to be blood and the blade of one of the R. H. Forschner knives tested positive with phenolphthalein. A bloodstain was also found on a pillow at the head of defendant's bed. Blood was found in other areas throughout the apartment and bare footprints of blood were found all over the floor in the kitchen. On that evening, defendant had a cast on his left hand.

An SBI agent who qualified as an expert in the field of fingerprint and palm print identification testified that a latent palm print on the wall of the bedroom of Ms. Chalflinch's apartment was the same as that of the left palm print of the defendant.

Several friends of defendant's testified that the ring found in Ms. Chalflinch's body was the ring normally worn by defendant.

Other evidence for the State tended to show that defendant attended a party on Sunday evening, 24 August 1980, where he played the role of disc jockey. He drank alcoholic beverages throughout the evening and took at least five "Black Beauties." During the party defendant was wearing his ring. At approximately 11:30 p.m., defendant and a group left the party and went

to a nightclub known as the Crash Landing. Members of the Southern Pines Police Department on patrol observed the defendant walking on the highway near the Crash Landing at approximately 2:10 a.m. on Monday, 25 August 1980. He was staggering, carrying his shoes and was barefooted. The officers gave him a ride to the kitchen entrance of the Pinehurst Hotel. They left him there at approximately 2:45 a.m.

A co-worker of defendant testified that she saw the ring in question on the Saturday before 25 August 1980. On the following Monday at approximately 7:00 a.m., she saw the defendant at work and he had two bandaids on his left hand in the thumb area. She did not observe the ring at that time. Defendant was in pain and told her that he had cut his hand.

Evidence for the defendant tended to show that the night shift supervisor at the Pinehurst Hotel saw the defendant in the hotel's front office between 2:30 and 3:00 a.m. on 25 August 1980. He left the front of the hotel at approximately 3:00 a.m.

A co-worker and friend of defendant's testified that defendant had been in apartment 9 of the Marriage Quarters before 25 August 1980. Two residents of apartments in the Marriage Quarters testified that they had been at home on the night of 24 August 1980 and had not heard anything unusual. One of these residents saw Ms. Chalflinch at approximately 11:00 p.m. on 24 August 1980. They talked and she stated that she had to do some laundry. He saw her through his apartment window again around 12:30 or 1:00 a.m. on 25 August 1980, heading toward the laundry.

Becky Mills, a nurse at Moore Memorial Hospital, testified that she first saw the defendant at approximately 11:00 p.m. on 25 August 1980. He was in the emergency room recovering from surgery resulting from cut tendons on his left hand and had a cast on his left arm. He left the hospital at approximately 4:10 a.m. on 26 August 1980.

Gaston Yarborough and Raymond Pate, employees of the hotel, testified that they passed by the Marriage Quarters on their way home from work on Monday, 25 August. They left work at approximately 11:00 p.m. They heard a lady hollering from the direction of the Marriage Quarters and a banging noise. Yarborough drove by the Marriage Quarters and saw that lights

were on only in the end apartment on the corner. Pate testified that he did not see Ms. Chalflinch's car in the parking lot when he went to work at approximately 2:30 p.m. on 25 August 1980. At 11:00 p.m., as he was walking to his truck to leave work, he heard noises from the direction of the Marriage Quarters. He heard a young girl's voice say, "Leave her alone, leave her alone." He then drove by the Quarters. He saw lights on only in the apartment in the right-hand corner. He looked up toward the lighted apartment and saw a white male with sandy blonde hair jump from the balcony. Pate told the police about this on 27 August 1980. He saw the person again on the following weekend and followed him into the hotel but lost him. He reported this to the police the same day, but they never inquired about it further until the Sunday prior to trial. On cross-examination, Pate testified that the person jumped off the balcony outside of apartment 12 and that he saw no one near apartments 9 and 10.

Upon receiving the jury verdict finding the defendant guilty of both murders, the court convened the sentence determination phase of the trial before the same jury. The State essentially relied on the testimony presented at the guilt phase but also offered the testimony of Roy Junior Brown. Brown testified that he was in Moore County jail as a prisoner at the time defendant was placed in the jail. Brown asked defendant what he was charged with and defendant said that he was charged with a double homicide. Brown testified:

> He said he murdered two people. He called one of their names Shelley (sic). He told me he killed them with a knife. He said he couldn't understand why they didn't give him his ring back, that they gave him his watch back, and it got broke off his arm, the band broke off, and I asked him where his ring was or something, I don't recall exactly what I asked him, but anyhow he said the ring turned up in one of the bodies.

Defendant presented several witnesses in his behalf. Several co-workers testified that they had known him for some time and had never seen or heard him threaten anyone with any act of violence and that he got along well with other people. Other testimony indicated that he had never been seen with a weapon; that he was an honest and dependable worker; that he was a

quiet person and did not use profanity. Some of defendant's relatives testified essentially that they had never known defendant to be violent and that he was always friendly and self-controlled.

At the conclusion of the testimony, the trial court instructed the jury on the sentencing phase. Two aggravating circumstances were submitted to the jury: (1) whether the murder was especially heinous, atrocious or cruel, and (2) whether the murder was part of a course of conduct in which the defendant engaged and whether that course of conduct included the commission by the defendant of other crimes of violence against another person. Six mitigating circumstances were submitted to the jury: (1) whether the defendant had no significant history of prior criminal activity, (2) whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to requirement of law was impaired, (3) whether, although the act itself may have been horrible, the defendant had not shown himself to be otherwise evil, (4) whether the defendant had no previous conviction of offenses involving injury to another person, (5) whether prior acts of defendant's behavior were inconsistent with the act of which he was convicted, (6) whether any other circumstance or circumstances arising from the evidence had mitigating value. The jury found both aggravating circumstances and all six mitigating circumstances. The jury also answered affirmatively the issues of whether, beyond a reasonable doubt, the aggravating circumstances found were sufficiently substantial to call for the imposition of the death penalty and of whether, beyond a reasonable doubt, the aggravating circumstances outweighed the mitigating circumstances. The following instruction appeared on the sheet handed the jurors immediately following the issue last mentioned: "If you answer issue 4 'No,' indicate life imprisonment under 'recommendation as to punishment.' If you answer issue 4 'Yes,' indicate death under 'recommendation as to punishment.'" Thereupon, the jury recommended that defendant be sentenced to death. Identical issues were submitted in both murder cases and the answers and recommendations were the same.

The trial court then entered judgment imposing the death penalty for each of the crimes committed. From these judgments, the defendant appealed of right to this Court.

## II.

### GUILT-INNOCENCE PHASE

Defendant presents numerous contentions about the guilt-innocence portion of his trial. We discuss each of these below.

### A.

In pre-trial discovery motions and motions made during the trial and immediately after judgment was entered, defendant sought a trial court order allowing him to inspect the premises known as apartment 9 of the Marriage Quarters, the scene of the crimes. The trial court denied defendant's motion in each instance. The apartment had been cordoned off and had been under the control of the Pinehurst Police Department from the time the victims' bodies were found until the time of the trial. Defendant claims that he was entitled to inspect the crime scene under G.S. 15A-903(d) and by virtue of his constitutional right to due process of law.

Defendant contends before this Court that an inspection of the crime scene was critical to his defense. He argues that the only way the State could prove that he committed the murders was to show that they occurred between 3:00 a.m. and 7:00 a.m. on 25 August 1980 and that he needed the opportunity to inspect the crime scene in order to discover whether there was any evidence which tended to show that the victims were alive after this period. An inspection of the crime scene, therefore, was critical to the preparation of his defense.

[1] We first turn to defendant's contention that he was entitled to view the crime scene under G.S. 15A-903(d). That statute provides in pertinent part:

> (d) Documents and Tangible Objects.—Upon motion of the defendant, the court must order the solicitor to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, motion pictures, mechanical or electronic recordings, *tangible objects*, or copies or portions thereof which are within the possession, custody, or control of the State and which are material to the preparation of his defense, are intended for use by the State as

evidence at the trial, or were obtained from or belonged to the defendant.

(Emphasis added.)

Defendant contends that "tangible objects" include such objects as an apartment. We do not agree. "Tangible objects," as used in this statute, refers only to tangible, movable objects, and not to buildings or rooms.

Rule 16 of the Federal Rules of Criminal Procedure, the federal counterpart of our G.S. 15A-903, specifically confers the right to "discover buildings or places." Our statute, on the other hand, does not include "buildings or places" in the list of things which may be discovered. This omission is, we think, significant. Had our Legislature intended for "buildings or places" to be included in the statute, it would have said so in the same words utilized in the federal statute. Thus, defendant is not entitled, under the terms of G.S. 15A-903(d), to inspect the crime scene.

[2] Defendant's contention that denial of his motions to view the crime scene amounted to a denial of due process of law is persuasive. We start with the proposition established by the Supreme Court of the United States that there is no general constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed. 2d 30 (1977). As that Court has stated, "the Due Process clause has little to say regarding the amount of discovery which the parties must be afforded . . . ." *Wardius v. Oregon*, 412 U.S. 470, 474, 93 S.Ct. 2208, 2212, 37 L.Ed. 2d 82, 87 (1973). We must, therefore, consider defendant's claim under the facts of this particular case. Here, the record discloses that the apartment occupied by the victims was secured and cordoned off by the Pinehurst Police Department from the time the bodies were discovered on 26 August 1980 through the time of defendant's trial. The defendant sought on several occasions to obtain access to the apartment in order to search for exculpatory evidence. The record does not disclose that the defendant would have been unwilling for his attorneys to be accompanied by police personnel so that no harm would be done to the crime scene. The defendant cogently presented the theory of his defense to the trial court. The State relied heavily on information gained from the crime scene for its case against the defendant. On these facts, we think it a denial of fundamental

fairness and due process for defendant to be denied, under police prosecutorial supervision, a limited inspection of the premises of the crime scene. We emphasize, however, that our holding is limited to the particular facts of this case and our holding is in no way to be construed to mean that police or prosecution have any obligation to preserve a crime scene for the benefit of a defendant's inspection. The crime scene here was preserved by the police for the several months from the time the bodies were found until the trial was conducted and rudimentary fairness would have allowed defendant to inspect these premises under these circumstances.

Our inquiry does not end here, however. Error committed at trial infringing upon a defendant's constitutional rights is presumed to be prejudicial and entitles him to a new trial unless the error committed was harmless beyond a reasonable doubt. G.S. 15A-1443(b); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967); *see Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed. 2d 424 (1977); *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed. 2d 1 (1972); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed. 2d 340 (1972). Overwhelming evidence of guilt may render constitutional error harmless. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed. 2d 284 (1969).

As stated in *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed. 2d at 710-11. Here, we declare our belief that the trial court's error in denying defendant access to the crime scene was harmless beyond a reasonable doubt because of other overwhelming evidence of defendant's guilt.

Our reading of the record here leaves no doubt that the trial court's error was harmless. This is so because evidence of this defendant's guilt was overwhelming. A ring identified as one previously worn by defendant was found in the body of Ms. Chalflinch. A bloody palm print lifted from the bedroom wall of the apartment was unquestionably identified as being that of the defendant. A bloody and broken knife blade similar to ones owned by defendant and used by him in his work was found at the crime scene. In addition to the blood at the crime scene, blood was located at the entrance of defendant's apartment and throughout

the apartment. Defendant confessed to his cellmate, after being arrested, that he had murdered two people, one named Shelly, with a knife and that his ring had turned up in one of the bodies.

In summary, we hold that the trial court erred under the facts of this case in failing to allow defense counsel to view the crime scene but that the trial court's error was harmless beyond a reasonable doubt. *See United States v. Valenzuela-Bernal*, 454 U.S. 963, 102 S.Ct. 3440, 73 L.Ed. 2d 1193 (1982).

B.

[3] Following the testimony of Mike Pagan, Marlene Ethal McIntosh, Ann Quick and Debra McLaughlin, witnesses who testified that the ring found in Ms. Chalflinch's body belonged to defendant, defense counsel requested copies of the statements which each witness had given to the police. At that point, the court noted that it had reviewed *in camera* the statements of the four witnesses and, based on its review, entered findings that the statements were not inconsistent with the witnesses' testimony, that the statements contained no evidence which exonerated the defendant, and that defense counsel was not entitled to copies of the statements given to the District Attorney's office prior to trial. Copies of the statements were made and were placed in a sealed envelope. Following the trial court's entry of this order, defense counsel asked that the court seal not only the four statements specifically requested, "but any statements written whether in longhand or otherwise." The trial court denied this motion.

By this assignment defendant requests that we review the sealed statements of the four witnesses to determine if the trial court ruled properly. He then contends, however, that he has a constitutional right to inspect the statements himself and that the procedures enunciated by this Court in *State v. Hardy*, 293 N.C. 105, 235 S.E. 2d 828 (1977), are inadequate in capital cases. Finally, defendant contends that the trial court erred in failing to inspect and seal any other written statements.

In *Hardy* this Court established the rules for our trial courts to follow in instances where a specific request is made at trial for disclosure of evidence in the State's possession that is obviously

relevant, competent and not privileged. As Justice Copeland stated, "justice requires the judge to order an *in camera* inspection when a specific request is made at trial for disclosure of evidence in the State's possession that is obviously relevant, competent and not privileged. The relevancy for impeachment purposes of a prior statement of a material State's witness is obvious." *Id.* at 127-28, 235 S.E. 2d at 842. The North Carolina discovery procedures, unlike the federal statute, do not automatically entitle the defendant to such statements at trial.

> Instead, . . . since realistically a defendant cannot know if a statement of a material State's witness covering the matters testified to at trial would be material and favorable to his defense, *Brady* and *Agurs* require the judge to, at a minimum, order an *in camera* inspection and make appropriate findings of fact. As an additional measure, if the judge, after the *in camera* examination, rules against the defendant on his motion, the judge should order the sealed statement placed in the record for appellate review.

*Id.* at 128, 235 S.E. 2d at 842.

Here, the trial court clearly complied with the mandates of *Hardy* with respect to the statements of the four named witnesses. Having found as a fact that the statements were not inconsistent with their testimony at trial and that they contained no evidence exculpatory to the defendant, the trial court declined to order them provided to the defense counsel and correctly ordered them placed in a sealed envelope. In accordance with the review procedure set out by *Hardy*, we have opened the sealed envelopes, read the statements in question and concur in every respect with the trial court's findings and order.

Nor are we persuaded that the procedure adopted in *Hardy* should be modified. Defendant has presented no new reasons for our doing so, and we continue to believe that the *Hardy* procedure fully assures a defendant that no material and exculpatory pretrial statement will be suppressed. Ordering the statements placed in sealed envelopes provides for effective appellate review. *See State v. McLean*, 294 N.C. 623, 242 S.E. 2d 814 (1978); *State v. Tate*, 294 N.C. 189, 239 S.E. 2d 821 (1978).

Finally, we reject defendant's contention that the trial court failed to comply with *Hardy* with respect to "any statements

written whether in longhand or otherwise." This request by defense counsel was obviously a shotgun tactic. Our review of the record discloses no evidence of any other statements which were available for the court to inspect and seal. Defendant apparently would have this Court assume that some other statements were available and that the trial court knew of them. This we are unwilling to do. We have no reason to suspect that any other statements were available and find no indication from the record that any witness was asked by defense counsel if he or she had previously given a statement in writing to police personnel.

These assignments of error are overruled.

## C.

[4] Defendant next contends that the trial court erred in denying his several motions concerning discovery of information in the State's possession indicating that a witness had seen a white male jumping from the balcony of a Marriage Quarters apartment on the evening of 25 August 1980, which information had not previously been provided defendant. We find no merit to defendant's contention.

After learning that law enforcement officers had been told by a witness, Raymond Pate, that he had observed a white male jump from a balcony of a Marriage Quarters apartment on Monday evening, the trial court conducted a lengthy voir dire. The voir dire revealed that officers had discounted this testimony because Pate had indicated to them, upon viewing the apartment complex that he had actually seen the man jump from the balcony of an adjacent apartment. Moreover, this information had not been disclosed to the District Attorney. It had been independently discovered by counsel for defendant approximately one week prior to trial. During the course of this voir dire, defendant moved for a dismissal, a mistrial, and a continuance. All three motions were denied by the trial court.

At the conclusion of the voir dire, the trial court found the facts as noted above and concluded that the District Attorney had not intentionally tried to hide any information contrary to the pre-discovery order entered in the cause and further found that the defense attorney had had substantially the same information as the District Attorney. We find the trial court's findings of fact

fully supported by the evidence adduced at the voir dire and that those findings properly support the conclusions of law.

G.S. 15A-910 gives the trial court ample authority to provide relief when either the State or defendant fails to comply with the discovery provisions of Chapter 15A. However,

> the exclusion of evidence for the reason that the party offering it has failed to comply with the discovery statutes granting the right of discovery, or with an order issued pursuant thereto, rests in the discretion of the trial court. . . . The exercise of that discretion, absent abuse, is not reviewable on appeal.

*State v. Hill*, 294 N.C. 320, 331, 240 S.E. 2d 794, 801-02 (1978) (citations omitted).

We find no abuse of discretion here. The record reveals that the District Attorney was not aware of this information until trial. The record further reveals that defense counsel became aware of the information a week before trial and had, in fact, talked with the witness. Most importantly, the witness testified before the jury and the jury heard a full account of what he observed on that evening. On these facts, there is no abuse of discretion. *See State v. Allison*, 298 N.C. 135, 257 S.E. 2d 417 (1979); *State v. McCoy*, 303 N.C. 1, 277 S.E. 2d 515 (1981).

[5] In a related argument, defendant contends that the trial court erred in refusing to permit him to inquire into the knowledge of a State's witness concerning another witness who allegedly had seen the decedents alive after 12:30 a.m. or 1:00 a.m. on 25 August 1980. On cross-examination of Sergeant Davis, a Pinehurst police officer, defendant asked, "Did you determine that one or more persons may have seen Diane Chalflinch after 1:00 a.m. on Monday morning?" The witness answered affirmatively. Defendant then sought to obtain the names of the witnesses and the State's objections were sustained. Defendant then attempted to have the questions answered for the record and the trial court refused. The trial court's explanation was that, "You have asked me to look and I looked *in camera* at a statement a witness gave where you contended that somebody saw Diane Chalflinch alive after midnight, and I have ruled that you were not entitled to that information at this time." Defendant

contends that (1) he was entitled to have the witness answer the question, and (2) at the very least, the question should have been answered for the record.

While we agree with defendant that the trial court should have allowed the witness to answer for the record, that alone does not warrant a new trial. The record discloses that regardless of defense counsel's inability to get his questions answered, the witness who claimed to have seen Ms. Chalflinch alive at 12:30 or 1:00 a.m. on 25 August 1980, Clarence Harding, was available to the defense and testified for the defense. Because defendant got this testimony before the jury he was in no way prejudiced by the trial court's earlier rulings and is not entitled to a new trial on this ground.

In this instance, we are bound by the trial court's ruling that the information was not exculpatory. We have not been provided a copy of the statement provided the trial court for *in camera* inspection and on which the trial court based its previous ruling. Moreover, the basis for the court's ruling in this instance was that it had previously found the information in the statement not to be exculpatory to the defendant. There is no indication that defendant requested that this statement be sealed or otherwise preserved for our review as provided by *Hardy*.

These assignments of error are overruled.

### D.

Defendant next attacks the admission into evidence of numerous items taken during a warrantless search of his apartment. The State sought to justify the search on the basis of consent. He argues that the search of his apartment was not based on lawful consent because (1) the evidence did not support a finding of consent, (2) a search warrant had supplanted the effect of any consent; and (3) evidence relevant to a determination of lack of consent had been improperly excluded. We discuss these arguments *seriatim*.

[6] Defendant essentially contends that the totality of the circumstances surrounding his "consent" impels the conclusion that it was not voluntarily given. He notes that he had been questioned by the SBI the day before the consent was given and that he had been followed by SBI agents for several miles prior to be-

ing stopped and questioned. He also notes that he was kept under surveillance by police personnel who later went with him to the security office of his employer, where he was kept for another two and one-half hours in the presence of several officers. Such circumstances, defendant argues, are tantamount to an arrest and the "psychological atmosphere" in which his consent was obtained should preclude allowance into evidence of those items seized during the search.

When the validity of a consent to search is challenged, the trial court must conduct a voir dire hearing to determine whether the consent was in fact given voluntarily and without compulsion. *State v. Cobb*, 295 N.C. 1, 243 S.E. 2d 759 (1978). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed. 2d 854, 862-63 (1973); *accord, State v. Jolly*, 297 N.C. 121, 254 S.E. 2d 1 (1979); *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971).

Here, the trial court conducted an extensive voir dire and heard the testimony concerning the events leading up to the signing of the consent form. The court found that the two SBI agents had talked with defendant and others about the alleged murders of the Chalflinches and informed defendant that they wanted to search his apartment; that they read defendant a printed form entitled "Consent to Search" which fully advised him that the search was for "any other material of evidence of any crime which they may desire," and that the officers did not have any authority to make such search without his consent; that the defendant signed the consent form in the presence of two police officers and a friend of defendant's with whom he had consulted; that defendant stated that he understood the form and understood his rights; that defendant was not under the influence of any alcohol or drugs; that no force or coercion was used against him or any promises made to him. From these findings of fact the trial court concluded that the defendant voluntarily, willingly and understandingly consented to the search of his premises and that any items seized as a result of the search were admissible at his trial.

We find that the trial court's findings of fact are amply supported by the evidence adduced at the voir dire hearing and that these findings fully support the trial court's conclusions of law. Taking into account all of the factors enunciated in *Schneckloth*, we hold that defendant's consent to the search was voluntarily given free from coercion in any form.

[7] Defendant next contends that, even assuming he had given consent, such consent was superseded and negated by the issuance of a search warrant which was read to him prior to the search of his apartment. We disagree.

Defendant cites no authority for the proposition that obtaining a search warrant negates prior consent to the search. It is clear from the record before us that the State relied on a consensual search and, as discussed above, the trial court properly ruled that defendant's consent was freely and voluntarily given. We cannot agree with defendant's reasoning that obtaining the warrant negates the consent originally given. Assuming the State had a valid search warrant, it had two bases to justify the search of defendant's apartment. At trial, the State had every right to rely on either. *See State v. Ratliff*, 281 N.C. 397, 189 S.E. 2d 179 (1972).

Nor do we find, as defendant contends, any evidence to conclude that defendant withdrew his consent as a result of the issuance of the search warrant. Indeed, the evidence is that, until the time of his arrest some one and one-half hours later, defendant was cooperative with the search and was allowed to go in and out of his apartment unrestrained. We hold that issuance and service of the search warrant in no way negated the consent originally given by defendant for the search of his premises and that the items seized during the search were admissible at trial.

Finally, defendant contends the trial court improperly refused to permit testimony on several matters relating to the circumstances leading to his giving consent to the search of his apartment. We have previously discussed the trial court's treatment of the defendant's challenge to the consensual search and find it unnecessary to do so again. Most of the matters which defendant now contends he was not allowed to pursue, such as the number of persons present at the time of the search, were otherwise before the trial court. The trial court had before it ade-

quate information concerning the totality of circumstances leading to the defendant's consent for the search. We reject defendant's contention here that the trial court abused its discretion by refusing, in effect, to relitigate the issue of consent.

These assignments of error are overruled.

E.

Defendant next challenges the admission of certain items of evidence: photographs of the victims taken at times prior to the murders, items seized during the search of defendant's apartment on which there were traces of blood, jewelry found in defendant's apartment and knives owned by defendant similar to the one found at the crime scene.

We have reviewed the photographs and testimony concerning the other items of evidence and find that they were properly admitted into evidence. We note only that the inability of the forensic serologist to state that the traces of blood found on items seized from defendant's apartment came from either of the victims goes to the weight or credibility of his testimony and not its admissibility. *See State v. Arnold*, 284 N.C. 41, 199 S.E. 2d 423 (1973).

F.

Defendant next assigns error to certain portions of the jury charge. Specifically, he contends that the trial judge erred (1) by expressing an opinion that defendant committed the killings, (2) by mischaracterizing the theory of the defense, (3) by incorrectly stating the evidence, (4) in more forcefully stating the law favorable to the State, and (5) by implying that the jury could find as a fact something that was not contained in the record. We have examined the portions of the charge to which defendant assigns error and find that the jury was properly instructed. These assignments of error are without merit and are hereby overruled.

G.

Counsel for defendant has been helpful to this Court in arranging his brief so that the remaining contentions concerning the guilt phase of defendant's trial are summarily presented. Counsel acknowledges that many of these issues have been previously addressed and candidly concedes that he would have

to "overcome substantial precedent" in order to prevail. Without unduly burdening this Court with extended argument, defendant requests that we review these issues and reconsider our prior holdings. We address them below.

[8] (1) Defendant first contends that in a capital case, an individual voir dire of the jurors should be allowed in order for defendant to receive a fair trial. He argues that it is inherently impossible for other members of the jury pool not to be affected by the types of questions asked potential jurors in a capital case. Defendant cites no new authority for his position and, indeed, this Court has previously rejected this argument. *E.g., State v. Oliver,* 302 N.C. 28, 274 S.E. 2d 183 (1981); *State v. Taylor,* 298 N.C. 405, 259 S.E. 2d 502 (1979); *State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907 (1980). On the point here presented, we reiterate our holdings in these cases. This assignment of error is overruled.

(2) Defendant next contends that he was denied due process and the effective assistance of counsel when the trial court refused to order that bench conferences be recorded. Defendant cites no authority for his position and our research discloses none. Defendant's bare assertion that the ability of counsel to raise points and record their disposition during trial was "so chilled" that he was denied the effective assistance of counsel and due process is simply unpersuasive. This assignment of error is overruled.

(3) Defendant next contends that he was unconstitutionally tried by a "death qualified" jury. He contends that a "death qualified jury is more likely to convict than a jury which is not "death qualified." This Court has previously rejected the argument here presented and is not inclined to disturb those holdings. See, *e.g., State v. Oliver,* 302 N.C. 28, 274 S.E. 2d 183; *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510; *State v. Cherry,* 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied,* 446 U.S. 941 (1980).

[9] (4) Defendant next contends that the trial court improperly limited the number of additional peremptory challenges which he requested. He argues that one charged with two capital offenses should be given additional peremptory challenges. This Court re-

jected a similar argument in *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752. This assignment of error is overruled.

**[10]** (5) Defendant next contends that his arraignment was illegal because the proceedings were remanded for findings of fact by the district court concerning the reasons for the continuance of his probable cause hearing. He argues that the result was to eliminate his hearing because of an imminent indictment.

This assignment of error is without merit. The failure to conduct a formal arraignment itself is not reversible error. *State v. Smith*, 300 N.C. 71, 265 S.E. 2d 164 (1980). The purpose of an arraignment is to allow a defendant to enter a plea and have the charges read or summarized to him and the failure to do so is not prejudicial error unless defendant objects and states that he is not properly informed of the charges. *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980). Moreover, there is no constitutional requirement for a preliminary or probable cause hearing. *State v. Hudson*, 295 N.C. 427, 245 S.E. 2d 686 (1978). A probable cause hearing is unnecessary after the grand jury returns an indictment. *State v. Lester*, 294 N.C. 220, 240 S.E. 2d 391 (1978). As this Court discussed in *Hudson*, a probable cause hearing is not designed to afford a means of discovery to defendant. Its function is to determine whether there is probable cause to believe the crime has been committed and that defendant committed it. This assignment of error is overruled.

**[11]** (6) Defendant next contends that the only source for a conclusion by the jury that premeditation and deliberation existed was the evidence concerning the nature and number of the victims' wounds. As we understand it, defendant is contending that his conviction of first degree murder should not stand because the essential ingredients of premeditation and deliberation were based upon a presumption.

This argument is clearly without merit. Evidence of the premeditation and deliberation required to sustain this defendant's conviction was supplied by circumstantial evidence, not by any presumption. The nature and number of the victims' wounds, as defendant notes, is one circumstance from which an inference of premeditation and deliberation could be drawn. There are, however, many others appearing of record. The trial court

correctly submitted the issues of premeditation and deliberation to the jury.

[12] (7) Defendant next contends that the trial court erred by failing to submit its charge to the jury in writing as requested by defendant. Defendant cites no authority in support of his position and no persuasive reasoning has been advanced. We note that the jury requested no clarification of the trial court's instructions and that it returned a verdict in just over one hour. Nothing in the record indicates that the jury was in any way confused or unable to understand or remember the trial court's instructions. This assignment of error is overruled.

[13] (8) Defendant next contends that the trial court impermissibly expressed its opinion by refusing to grant the defendant's request that he be referred to by his name and not as "the defendant." This is particularly true, defendant contends, when the victims are referred to by name. This Court is unable to imagine the slightest prejudice resulting to defendant from the historical practice in our trial courts of referring to the defendant as "the defendant." This assignment of error is overruled.

[14] (9) Defendant next contends that the trial court improperly failed to charge the jury on the issue of his good character. We disagree. Defendant did not introduce character evidence. The testimony offered in his behalf did not indicate his general reputation among a group of people but consisted only of several witnesses' personal opinion of the defendant. As this Court stated, in rejecting a similar contention, in *State v. Williams*, 299 N.C. 652, 662, 263 S.E. 2d 774, 781 (1980), "Such evidence is not competent character evidence and the trial judge's failure to instruct the jury on this evidence is accordingly not error."

[15] (10) Defendant next contends that the trial court improperly denied his request for the appointment of a polygraph examiner. Defendant argued that he had no independent recollection of the events occurring between 4:00 a.m. and 7:00 a.m. on 25 August 1980, and that polygraph results could be used to show his state of mind. This Court has recently written at length concerning the appropriate legal principles for appointment of assistance of an expert and find it unnecessary to repeat that extensive discussion here. *See State v. Parton*, 303 N.C. 55, 277 S.E. 2d 410 (1981). Suffice it to say that the decision of whether to appoint an expert is

a matter within the discretion of the trial judge and will not be disturbed absent an abuse of that discretion. Here we can perceive no abuse. *See State v. Easterling,* 300 N.C. 594, 268 S.E. 2d 800 (1980); *State v. McDowell,* 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied,* 450 U.S. 1025 (1981); *State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752.

[16] (11) Defendant next contends that he was entitled to receive, upon request, criminal records of the State's witnesses. G.S. 15A-903 nowhere provides for discovery of the criminal records of the State's witnesses. Indeed, a provision authorizing the discovery of such material was included in the draft of the original bill and was subsequently deleted. G.S. § 15A-903, Official Commentary (1978); *accord, State v. Smith,* 291 N.C. 505, 523-24, 231 S.E. 2d 663, 675 (1977). This assignment of error is overruled.

III.

SENTENCING PHASE

Defendant next assigns several errors relating to the sentencing proceedings. We discuss these contentions *seriatim.*

A.

Defendant first contends that the trial court improperly submitted the aggravating circumstance that the murders were "especially heinous, atrocious, and cruel," G.S. § 15A-2000(e)(9) (1978). In support of this argument, defendant argues that (1) the only evidence on which this finding could have been based was also an essential element of the State's proof of first degree murder and (2) the only evidence suggesting unnecessary cruelty to the victim was the multiplicity of wounds which were not established beyond a reasonable doubt as having occurred before the death of the victim.

[17] Defendant's first contention is based on this Court's holdings in *State v. Goodman,* 298 N.C. 1, 257 S.E. 2d 569 (1979) and *State v. Cherry,* 298 N.C. 86, 257 S.E. 2d 551. In those cases we held that the underlying felony in a first degree murder conviction based upon the felony-murder doctrine could not be submitted as an aggravating circumstance. Recognizing the doctrine of merger, we held that the underlying felony merged with the murder convictions and therefore use of the same felony to

enhance the punishment violated the double jeopardy provisions of the federal constitution. We did not hold that the jury was prohibited from considering the evidence justifying the conviction of the underlying felony but held only that the underlying felony itself could not be used as an aggravating circumstance.

Here, of course, defendant was not tried under the felony-murder rule. He was tried and convicted of these first degree murders on the basis of premeditation and deliberation. No underlying felony was involved. This Court has rejected similar arguments in *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183, and *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981). In *Oliver*, we interpreted *Cherry* and *Goodman* to apply only to the underlying felony itself and not to the facts surrounding the commission of the felony. In *Hutchins*, we rejected the argument that the facts underlying the State's theory of the case merged with the offense and could not be used to enhance the penalty.

[18] We also disagree with defendant that this aggravating circumstance should not have been submitted because the multiplicity of wounds was the only fact to support a jury finding necessary to establish the murder as one especially heinous, atrocious and cruel because the evidence does not support the conclusion beyond a reasonable doubt that the wounds inflicted were administered before the death of the victims. Here, defendant is relying on the testimony of the pathologists who stated that they could not be certain that all of the victims' wounds were inflicted prior to death. Defendant's contention is that an especially heinous, atrocious and cruel murder must be one inflicted on a conscious victim.

This assignment is patently without merit. We will not lengthen this opinion by again reciting the gruesome and gory facts summarized above. Indeed, it is unnecessary for us to answer the question whether this aggravating circumstance may be employed when the evidence establishes that a portion of the defendant's acts took place after the death of the victim. This is so because there was abundant evidence here that many of the wounds were inflicted prior to death. Additionally, the character and severity of the wounds support the submission of this aggravating circumstance. Of particular importance is the pathological evidence that some of the wounds appeared to be

defensive, some sixteen on Ms. Chalflinch's right arm. Indeed, the inference from the evidence appearing in this record arises above the level of that we have reviewed in previous cases in which we have upheld the admission of this particular aggravating circumstance. This assignment of error is overruled.

B.

[19]  Defendant next contends that the trial court erred in refusing to submit requested mitigating circumstances that (1) the defendant did not act in a calculated manner, (2) the defendant did not act for pecuniary gain, and (3) the defendant was under the influence of mental or emotional disturbance.

This Court has previously defined a mitigating circumstance as follows:

> A definition of mitigating circumstance approved by this Court is a fact or group of facts which do not constitute any justification or excuse for killing or reduce it to a lesser degree of the crime of first-degree murder, which may be considered as extenuating, or reducing the moral culpability of killing or making it less deserving of the extreme punishment than other first-degree murders.

*State v. Irwin*, 304 N.C. 93, 104, 282 S.E. 2d 439, 446-47 (1981). That the murder was not committed in a calculated manner is not, in our opinion, a mitigating circumstance. Indeed, it is difficult for this Court to understand how a murder committed after premeditation and deliberation is not done in a calculated manner.

Moreover, the State does not have the burden of proof that, in a given capital case, no mitigating circumstances exist. *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510. It is the responsibility of the defendant to go forward with evidence that tends to show the existence of a given mitigating circumstance and to prove its existence to the satisfaction of the jury. *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788. Our review of the record discloses no evidence from the defendant that he did not act in a calculated manner. Indeed, as discussed in connection with other contentions above, the evidence is to the contrary. From the evidence that a bloody knife blade was found in the victims' apartment which was of the same type as the knives in defendant's tool box, the jury could have, and apparently did, infer that the knife used to kill

the victims was taken up to their apartment by the defendant for that purpose.

We express no opinion on whether the evidence shows that defendant did not act for pecuniary gain. Even assuming that it does, the evidence merely shows the absence of an aggravating circumstance and not the presence of a mitigating one.

At trial, defendant contended that he was entitled to the mitigating circumstance that he acted under the influence of mental or emotional disturbance as contemplated by G.S. 15A-2000(f)(2). In support, he relied on the testimony concerning his use of alcohol and drugs on Sunday evening, 24 August 1980.

We have answered this issue in *State v. Irwin*, 304 N.C. at 106, 282 S.E. 2d at 447-48. There, we said:

> voluntary intoxication by alcohol or narcotic drugs at the time of the commission of a murder is not within the meaning of a mental or emotional disturbance under G.S. 15A-2000(f)(2). Voluntary intoxication, to a degree that it affects defendant's ability to understand and to control his actions . . . is properly considered under the provision for impaired capacity, G.S. 15A-2000(f)(6).

(Citation omitted.) The trial judge here correctly followed the law established by *Irwin*. He submitted the mitigating circumstance of impaired capacity and the jury found this mitigating circumstance in both murders.

This assignment of error is overruled.

### C.

[20]   During the sentencing phase of the defendant's trial, the State presented the testimony of Roy Junior Brown (Roy). Roy testified that defendant told Roy in jail that he, defendant, had murdered two people using a knife and that he did not understand why his ring was not given back to him. Defendant's next contention is that this testimony was improperly admitted because it referred only to the guilt or innocence of the defendant and not to any aggravating or mitigating circumstances. Defendant's contention is without merit.

G.S. 15A-2000(a)(3) provides that the State is not required to resubmit evidence presented during the guilt determination

phase of the case at the sentencing phase. However, all such evidence is competent for the jury's consideration in passing on punishment. Moreover, "[a]ny evidence which the court deems to have probative value may be received." G.S. § 15A-2000(a)(3) (1978). Here the trial court obviously deemed Brown's testimony to be relevant and to have probative value. Because the testimony would have been admissible at the guilt phase of the trial, we are unwilling to hold that evidence clearly proper for the jury to consider under the statute had it been presented at the guilt phase of the trial is inadmissible simply because it was introduced at a later stage of the proceedings.

Additionally, the evidence is relevant to rebut evidence submitted by the defendant at the guilt phase of the trial which would support mitigating circumstances. This is especially true with respect to the mitigating circumstance that defendant was suffering from a mental impairment as a result of alcohol and drug use. The testimony from the witness Roy Brown that defendant stated that he had killed two persons with a knife and that his ring was later found in one of the bodies is some evidence that defendant was not so intoxicated at the time of the murders that he was not aware of what he was doing and could not remember them. The testimony also tended to rebut other testimony introduced by the defendant at the guilt phase concerning his good conduct in the past and was, therefore, relevant to the mitigating circumstance of "although the act itself may have been harmful, the defendant has not shown himself to be otherwise evil" by showing defendant's lack of remorse.

For the reasons stated, this assignment of error is overruled. However, we would note for the benefit of the trial courts that the better procedure, in a situation in which the evidence relates only to guilt or innocence, is to present such evidence during the guilt determination phase.

[21] Finally, under this contention, defendant argues that the trial court erred by refusing to allow him to question the assistant district attorney on voir dire concerning promises made by the State to the witness who testified at the sentencing phase. We think the trial court acted properly in refusing to allow defendant to examine, as a hostile witness, a fellow officer of the

court concerning information which defendant failed to elicit from the witness whose testimony he was seeking to discredit. During the lengthy voir dire, Roy Brown took the stand and stated that some time after revealing the information to officers, he was taken before a judge and tried for two of the counts for which he was in prison and that he received a suspended sentence and his bond was substantially reduced. With this information from the voir dire, defendant had, it seems to us, sufficient information to pursue his concern that Roy Brown's testimony was in exchange for favorable treatment by the State. However, when the witness testified before the jury, Roy Brown was not asked any questions about any such consideration or about the disposition of charges against him. We agree with the State that the appropriate avenue of inquiry into the bias of a witness is to ask the witness himself.

This assignment of error is overruled.

## D.

[22] Defendant next argues that the trial court improperly charged the jury concerning the possibility of parole for a life sentence. We find no error in these instructions.

The jury, after some deliberation during the sentencing phase, inquired of the court concerning the chances for parole from a life sentence. The defendant requested that the jury be instructed that "life sentence means life sentence, and death means death." Instead, the court gave the following instruction:

> I instruct you that the question of eligibility for parole is not a proper matter for you to consider in recommending punishment and it should be eliminated entirely from your consideration and dismissed from your mind. In considering whether to recommend death or life imprisonment, you should determine the question as though life imprisonment means exactly what it says, imprisonment in the State Prison for life. You should decide the question of punishment according to the issues submitted to you by the Court wholly uninfluenced by consideration of what another arm of the government might or might not do at some time in the future.

After the jury had been given this instruction, defendant requested that the court charge the jury as follows:

> Under the law of the State of North Carolina, a defendant sentenced to life imprisonment for first degree murder is never entitled to a parole and a defendant who is sentenced to two consecutive terms of life imprisonment for first degree murder is not even eligible for consideration for parole until 40 years has passed.

The trial court refused his request. Defendant assigns error to the refusal to charge the jury according to his requests.

While the tendered instruction by the defendant is a correct statement of the law, that submitted by the trial court is also correct and in accordance with instructions previously approved by this Court. The trial court is not required to instruct the jury in the precise words requested by the defendant. The instruction given by the trial court conveyed the substance of defendant's first request. No more is required.

The long-standing rule in this jurisdiction is that a defendant's eligibility for parole is not a proper matter for consideration by a jury. *E.g., State v. Conner*, 241 N.C. 468, 85 S.E. 2d 584 (1955). That is exactly what the trial court told the jury. Defendant's requested instruction concerning the eligibility for parole, although a correct statement of the law, was not appropriate information for the jury to consider in its deliberations. We find no error in the instruction given by the trial court or in its refusal to instruct the jury according to defendant's requests.

This assignment of error is overruled.

E.

[23]  The trial court submitted each of the two killings as an aggravating circumstance for the other under the "course of conduct" provision of G.S. 15A-2000(e)(11). Defendant argues that the submission of each murder as an aggravating circumstance for the other violates double jeopardy. This Court has rejected a similar argument, based on similar reasoning, in *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982). Justice Copeland, writing for the Court, has presented a thorough discussion of this contention in Section XII of the opinion in *Pinch*, 306 N.C. at 29, 292 S.E. 2d

at 225, and it is unnecessary for us to repeat it here. Suffice it to say that for the reasons stated in *Pinch*, this assignment of error is overruled.

[24]  In connection with this contention, defendant also argues that the trial court committed prejudicial error by submitting an aggravating circumstance which was not listed by the State in its response to defendant's motion for a bill of particulars. In its motion for a bill of particulars defendant requested notice of which aggravating circumstances would be relied on by the State at trial. The State responded, but did not include in its list the aggravating circumstance that the murder was part of a course of conduct in which the defendant engaged in crimes of violence against another person, G.S. § 15A-2000(e)(11) (Cum. Supp. 1981). Defendant contends that (1) due process requires such notice, and (2) the order of the trial court concerning defendant's motion for a bill of particulars required the disclosure.

This Court has previously rejected defendant's due process argument in *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981). There, we reasoned that the only aggravating circumstances on which the State may rely are enumerated in G.S. 15A-2000(e) and that this statutory notice is sufficient to meet the constitutional requirements of due process. We reiterate that holding here.

We also disagree with defendant that the trial court erred in submitting this aggravating circumstance because the State did not comply with the order resulting from his motion for a bill of particulars. The trial court's order stated:

> That the Court ORDERS that the State disclose to the defendant's counsel the aggravating circumstances in the above referenced case; that the Court further ORDERS that the State may disclose the aggravating circumstances without prejudice and that the State may rely on other circumstances as the evidence and circumstances become known to the State.

The State did disclose the other aggravating circumstances on which it eventually relied. We think the trial court's order merely required the State to disclose those aggravating circumstances which it knew it intended to use at the time it responded to the motion for the bill of particulars. In that light,

the State complied with the trial court's order. We do not believe the trial court intended to limit the State to those disclosed. Indeed, the court clearly indicated that its order was to be "without prejudice" to the State.

While not essential to our decision here, we do agree with the State that G.S. 15A-925 does not authorize a trial court to order the State to disclose its aggravating circumstances prior to trial. That statute provides:

> (b) A motion for a bill of particulars must request and specify items of *factual information* desired by the defendant which pertain to the charge and which are not recited in the pleading, and must allege that the defendant cannot adequately prepare or conduct his defense without such information.

(Emphasis added.)

The trial court ordered the State to "disclose to the defendant's counsel the aggravating circumstances in the above-referenced case." We agree with the State that aggravating circumstances are not "factual information" within the meaning of G.S. 15A-925.

This assignment of error is overruled.

### F.

[25] Defendant next contends that the trial court erred in instructing the jury that it *must* recommend that defendant be sentenced to death if it found that the aggravating circumstances outweighed the mitigating circumstances. This argument, based on similar reasoning, has been recently rejected by this Court in *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982), and *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243 (1982). These opinions fully discuss this assignment of error and we find it unnecessary to lengthen this opinion by repetition of the discussions contained in those cases. For the reasons stated in *Pinch* and *Williams*, this assignment of error is overruled.

### G.

[26] Defendant next contends that, in a capital case, the trial court on request should instruct the jury on the consequences of

State v. Brown

the inability of all of its members to agree on a sentence. Defendant asked the trial court to charge that a sentence of life imprisonment would be imposed in the event that the jury failed to reach unanimous agreement on the proper sentence.

Again, this Court has specifically addressed and rejected the argument here presented by the defendant in *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788; *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752. We reiterate those holdings and overrule this assignment of error.

### H.

Defendant finally contends that the death penalty constitutes cruel and unusual punishment under the eighth amendment of the United States Constitution and may not be imposed.

This assignment of error has been rejected on numerous occasions, *e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed. 2d 859 (1976); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979), and we are presented with no additional reasoning to change our position.

### IV.

[27]   As noted in *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, --- U.S. --- (No. 81-6143, March 22, 1982), G.S. 15A-2000(d)(2) directs this Court to review the record in a capital case to determine whether the record supports the jury's finding of any aggravating circumstance, whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.[1] As stated in *Rook*, this mandate serves as a check against the capricious or random imposition of the death penalty, and our review function in this regard is limited to those instances where both phases of the trial of the defendant in a capital case have been found to be

---

1. This Court has not yet stated whether the "similar cases" for comparison purposes consist of cases in which the death penalty was imposed or all first degree murder cases regardless of the punishment. As noted in my concurring opinion in *State v. Pinch*, --- N.C. ---, --- S.E. 2d --- (No. 43A81, filed 2 June 1982), I would compare the death sentence in the case at issue to all similar first degree murder cases regardless of the punishment.

free from prejudicial error. In fulfilling this role, we are sensitive not only to the mandate of the Legislature but to the constitutional dimensions of our review.

Mindful of the very serious responsibility placed on us by G.S. 15A-2000(d)(2), we have carefully reviewed the record of this case along with the briefs and oral arguments. We conclude that there is sufficient evidence in the record to support the jury's findings as to the aggravating circumstances submitted. We also find nothing in the record to indicate that the sentence of death was imposed under the influence of passion, prejudice and any other arbitrary factor.

The record before us reveals two of the most bloodthirsty and brutal crimes which have ever been reviewed by this Court. We again refrain from repeating gory details summarized at the beginning of this opinion. Suffice it to say that this defendant has been convicted of stabbing to death a young mother and her child, with no apparent motive, and extensively mutilating their bodies. The bloody facts disclosed by the record before us leave this Court with no choice but to conclude that the sentence of death imposed is not disproportionate or excessive considering both the crime and the defendant. We, therefore, decline to exercise our discretion to set aside the death sentence imposed.

In all phases of the trial below, we find

No error.

Justice EXUM dissenting as to sentence.

For the reasons stated in Part I of my dissenting opinion in *State v. Pinch*, 306 N.C. at 38, 292 S.E. 2d at 230 (1982), I believe it was prejudicial error for the trial judge to instruct the jury that it had a duty to recommend the death sentence if it answered certain issues favorably to the state.

Therefore I vote to vacate the death sentence and to remand for a new sentencing hearing. I concur with the result reached by the majority in the guilt phase of the case.