STATE OF NORTH CAROLINA v. JAMES ADOLPH CAMPBELL

No. 299A93

(Filed 28 July 1995)

**1. Indigent Persons § 19 (NCI4th)— first-degree murder— appointment of state psychiatrist as defense witness**

There was no error in a first-degree murder trial where the trial court appointed a forensic psychiatrist who worked for a state facility and who had handled the competency determination to assist defendant at trial. Assuming that defendant made an adequate showing of a specific need for an expert, the record establishes that defendant received adequate assistance from the psychiatrist, Dr. Rollins, in the presentation of mitigating evidence in that Dr. Rollins offered his opinions at trial; those opinions were based upon four interviews with defendant, defendant's statement, investigative reports, reports of interviews with defendant's mother and sisters, and Dr. Rollins' interview with defendant's sister; Dr. Rollins testified that defendant had two types of mental disorders, one of personality and one of adjustment; that defendant's ability to understand appropriate standards of behavior was affected by these disorders and was impaired further by his use of marijuana; that defendant began using marijuana when he was eleven or twelve; that defendant's youth was characterized by poverty-related concerns for food, clothing, and shelter; and Dr. Rollins's testimony was the sole supporting evidence for the lone statutory mitigating circumstance found by one or more jurors, mental or emotional disturbance, and also supported two nonstatutory mitigating circumstances, emotional neglect and a history of substance abuse beginning at an early age, that were found by one or more jurors.

**Am Jur 2d, Criminal Law §§ 955, 1006.**

**Right of indigent defendant in state criminal case to assistance of psychiatrist or psychologist. 85 ALR4th 19.**

**2. Jury § 106 (NCI4th)— first-degree murder—jury selection—group questions required**

There was no abuse of discretion in a first-degree murder prosecution where the defendant contended that the trial court prohibited defendant from asking questions of prospective jurors individually and allowed individual questions only if a group

question produced a response from some jurors. Defendant was allowed to question jurors individually at several points during jury selection and the jurors responded individually to group questions if the questions required an individualized response based on their personal situations. It is within the trial court's discretion to regulate the manner and extent of inquiries on *voir dire*.

**Am Jur 2d, Jury § 198.**

3. **Criminal Law § 375 (NCI4th)— first-degree murder—comments by judge—no error**

There was no error in a first-degree murder prosecution in a comment by the court that "I think I've tested the jury's attention span for today" during defendant's testimony or in a later comment that on the next day the court would give the jury the law that pertains to this "sad situation." The comment regarding the attention span stated that the court, not defendant, had tested the jury's attention span and simply referred to the court's responsibility to manage the trial. The reference to a sad situation was not an expression of opinion by the court; defendant did not allege self-defense or justifiable homicide but claimed that someone else committed the murder, and the characterization of the situation as sad would seem to be a universal sentiment.

**Am Jur 2d, Trial § 276.**

4. **Criminal Law § 466 (NCI4th)— capital murder—prosecutor's argument—treatment of rape victim by defense attorney**

There was no error in a capital first-degree murder prosecution requiring *ex mero motu* intervention where the prosecutor referred in closing argument to the cross-examination of a witness other than the victim in this case who testified that she had been kidnapped and raped by defendant. Defendant's prior crimes were introduced to show a pattern of behavior and the credibility of this witness was therefore important. It is not improper for the prosecutor to refer to the demeanor of a witness during the ordeal of testifying as evidence of her truthfulness, and the prosecutor emphasized that the purpose of the testimony was to aid the jury in determining what happened to the victim in this case.

**Am Jur 2d, Trial § 614.**

STATE v. CAMPBELL

[340 N.C. 612 (1995)]

**5. Criminal Law § 445 (NCI4th)— capital murder—prosecutor's argument—personal opinion—full prosecution**

The Supreme Court could not say in a capital first-degree murder prosecution that there was error requiring correction *ex mero motu* where defendant contended that the prosecutor conveyed to the jury his opinion that the case warranted full prosecution. Even assuming error in the prosecutor's statement that he was not in charge of defendant's prior cases when the charges were dropped, it could not have been prejudicial given the evidence against defendant, including his own pretrial confession. Further, the overall thrust of the argument was to point out why defendant gave a confession that he later contradicted in his trial testimony.

**Am Jur 2d, Trial § 554.**

**6. Criminal Law § 436 (NCI4th)— first-degree murder—prosecutor's argument for conviction—deterrence**

There was nothing improper in a first-degree murder prosecution where the prosecutor argued that defendant should be convicted so that he would not commit crimes in the future.

**Am Jur 2d, Trial §§ 554, 568.**

**7. Criminal Law § 1322 (NCI4th)— first-degree murder—sentencing—jury's questions regarding parole eligibility—instructions**

The trial court did not err in a first-degree murder prosecution in its instruction given in the sentencing hearing in response to the jury's questions regarding parole eligibility. Although defendant argues that the court should have included in the instruction the statement that "life means life," the court told the jury what was required: that it was not to consider parole in its deliberations. The trial court does not have to instruct the jury in the precise words the defendant requests.

**Am Jur 2d, Trial §§ 286, 1443.**

**Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.**

**8. Criminal Law § 475 (NCI4th)— first-degree murder—sentencing— jury's exposure to defendant's escape attempt—questions by court**

There was no error in the sentencing hearing in a first-degree murder prosecution in the trial court's inquiries to the jury fol-

lowing a failed escape attempt by defendant where defendant stated that he did not know whether the jurors in question had seen him, one juror stated that she had seen only broken glass, another stated that he had seen broken glass but it would not impact his deliberations, another stated that he had seen a repairman working on the window, and the jury as a whole indicated that it could go by the evidence. Although defendant contends that the court failed to make a thorough inquiry, the court made a proper, individual inquiry of the three jurors, it is apparent from their *voir dires* that the three were aware only of a broken window, which does not readily suggest that defendant attempted to escape, and the entire jury indicated that it could be fair and impartial.

**Am Jur 2d, Trial §§ 1544, 1545.**

### 9. Criminal Law § 446 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—desire of community

There was no error in the sentencing hearing in a first-degree murder prosecution where defendant contended that the prosecutor argued that the jury was obligated to return a sentence of death because the community expected it, but the prosecutor merely stated that the law is in accord with the community's view of the appropriate punishment and that the jury should follow the law in reaching its recommendation.

**Am Jur 2d, Trial § 648.**

**Prejudicial effect of prosecuting attorney's argument to jury that people of city, county, or community want or expect a conviction. 85 ALR2d 1132.**

### 10. Criminal Law § 436 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—defendant's enjoyment of murder

There was no error in the sentencing hearing in a first-degree murder prosecution where defendant contended that the prosecutor's argument that defendant had enjoyed the killing was not based on evidence and was extremely inflammatory, but there was evidence to support the prosecutor's argument.

**Am Jur 2d, Trial § 572.**

**11. Criminal Law § 434 (NCI4th)—first-degree murder—sentencing— prosecutor's argument—prior misconduct**

There was no error in a first-degree murder prosecution where defendant contended that the prosecutor's argument emphasized the suffering of the victim of defendant's prior misconduct. However, the prosecutor may argue that defendant's criminal history deserves great weight.

**Am Jur 2d, Trial § 626.**

**12. Criminal Law § 432 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—defendant not human**

There was no impropriety requiring *ex mero motu* intervention in a first-degree murder prosecution where defendant contended that the prosecution had argued that defendant was not a human being, but the prosecutors characterized defendant's depravity as a void in his character and did not directly call him an animal. The character of a defendant is an appropriate consideration during sentencing.

**Am Jur 2d, Trial § 648.**

**13. Criminal Law § 466 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—credibility of defendant's attorneys**

There was no error in a first-degree murder prosecution where defendant contended that arguments by the prosecutor were designed to denigrate the credibility of defendant's attorneys, to punish him for having consulted with his counsel during trial, and to punish his counsel in advance for making arguments that would attempt to convince the jury that a life sentence was the appropriate punishment, but the argument did not implicate defendant's right to counsel.

**Am Jur 2d, Trial §§ 683, 686.**

**Propriety and effect of attack on opposing counsel during trial of a criminal case. 99 ALR2d 508.**

**14. Criminal Law § 1320 (NCI4th)— first-degree murder—sentencing—instructions—same evidence supporting more than one aggravating circumstance**

There was no error in the sentencing hearing in a first-degree murder prosecution where the court did not *ex mero motu* instruct the jury that it could not consider the same evidence as

STATE v. CAMPBELL

[340 N.C. 612 (1995)]

supportive of more than one aggravating circumstance. Four aggravating circumstances were submitted and four were found, defendant concedes that the circumstances all could have been properly considered without double-counting the evidence, and it need only be determined whether the court should have instructed the jury so as to prevent duplicative use of the evidence. It is unlikely that the court's failure to instruct *ex mero motu* on the duplicative use of evidence had a probable effect on the sentencing recommendation. The murder was particularly savage, the victim was stabbed many times and could have lived for a time after the wounds were inflicted, there was separate evidence to support each aggravating circumstance, and the court's instruction that defendant contends compounded the problem was likely interpreted by the jurors as permission to consider both guilt and sentencing phase evidence rather than as license to use the same evidence to support more than one circumstance.

Am Jur 2d, Trial §§ 1441, 1444.

15. **Criminal Law § 1322 (NCI4th)— first-degree murder—sentencing—no instruction on life without parole**

There was no plain error in a first-degree murder sentencing hearing where the court failed to inform the jury that defendant would never be paroled, given his expected life span, if he were sentenced and received consecutive life sentences. Under the statutes in effect when the murder was committed, defendant would have been eligible for parole after serving twenty years in prison had he received life; an instruction that he would be ineligible for parole if he received life therefore would have been an incorrect statement of the applicable law. Furthermore, parole eligibility does not reveal anything about the defendant's character or record or any circumstances of the offense and therefore is irrelevant to the sentencing process.

Am Jur 2d, Trial §§ 286, 1443.

Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.

16. **Jury § 226 (NCI4th)— first-degree murder—jury selection—death qualification—rehabilitation**

There was no error in a capital murder prosecution where the court denied defendant the right to examine each juror challenged by the State during death qualification prior to his or her

excusal and by excusing jurors whom defendant was not permitted to question.

**Am Jur 2d, Criminal Law §§ 679, 680.**

**17. Criminal Law § 1320 (NCI4th)— first-degree murder—sentencing—instructions—consideration of evidence from both phases of trial**

The trial court did not err in a first-degree murder sentencing hearing by instructing the jury that all evidence in both phases of the trial was competent for the jurors' consideration.

**Am Jur 2d, Trial §§ 1441, 1444.**

**18. Criminal Law § 1343 (NCI4th)— first-degree murder—sentencing—especially heinous, atrocious, or cruel aggravating circumstance—instructions**

The trial court did not err in a first-degree murder prosecution by submitting to the jury the "especially heinous, atrocious, or cruel" aggravating circumstance with instructions that allegedly failed adequately to limit the application of the circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**19. Criminal Law § 1351 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—instructions—burden of proof**

The trial court did not err in a first-degree murder prosecution in its instructions on the burden of proof applicable to mitigating circumstances through use of the terms "satisfaction" and "satisfy" as defining the burden of proof.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

STATE v. CAMPBELL

[340 N.C. 612 (1995)]

**20. Criminal Law § 1323 (NCI4th)— first-degree murder—sentencing—instructions—value of mitigating circumstances**

The trial court did not err in a first-degree murder sentencing hearing in its instructions by allowing the jury to reject a mitigating circumstance on the basis that it had no mitigating value.

**Am Jur 2d, Trial §§ 1441, 1444.**

**21. Criminal Law § 1318 (NCI4th)— first-degree murder—sentencing—instructions—use of "may"**

The trial court did not err in a first-degree murder sentencing hearing in the use of the term "may" in sentencing recommendation issues three and four because this gave the jury discretion in considering proven mitigating circumstances.

**Am Jur 2d, Trial §§ 1441, 1444.**

**22. Criminal Law § 1373 (NCI4th)— first-degree murder—death sentence—proportionality**

A sentence of death for a first-degree murder was not disproportionate where the crime was distinguished by the brutal attack on the victim, which consisted of attempted strangulation and multiple stab wounds to her face and neck; the rape of the victim, which occurred prior to her death; and the kidnapping of the victim; defendant was found guilty of murder based on both the felony murder rule and on malice, premeditation, and deliberation, which indicates a more cold-blooded and calculated crime; the jury found all submitted aggravating circumstances and found only three of thirteen mitigating circumstances submitted; and the jury found that defendant is a recidivist whose prior convictions were for violent felonies.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Greeson, J., at the 24 May 1993 Criminal Session of Superior Court, Rowan County, on a jury verdict finding defendant guilty of first-degree murder, robbery with a dangerous weapon, two counts of first-degree rape on a female victim, burning of personal property, and first-degree kidnapping.

Defendant's motion to bypass the Court of Appeals on the convictions other than first-degree murder was allowed 2 August 1994. Heard in the Supreme Court 16 March 1995.

*Michael F. Easley, Attorney General, by Debra C. Graves, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried capitally for first-degree murder and found guilty on that and all other charges. After a capital sentencing proceeding, the jury recommended that defendant be sentenced to death for the first-degree murder conviction. The trial court sentenced defendant to death for the first-degree murder conviction; to forty years' imprisonment for the armed robbery with a dangerous weapon conviction; to two terms of life imprisonment for the first-degree rape convictions; to ten years' imprisonment for the burning of personal property conviction; and to thirty years' imprisonment for the kidnapping conviction. All sentences were to run consecutively.

The State's guilt phase evidence tended to show the following:

Brandy McIntyre testified that she left her trailer on the morning of 8 September 1992 to run errands. Katherine Price, the victim, was there when she returned. Price and Brandy walked to a nearby convenience store to purchase food. As they walked, defendant approached them. He asked Brandy what time her husband returned home from work. Brandy told him her husband was at home. Price said nothing during the conversation. When Price and Brandy returned from the store, defendant was at Brandy's trailer talking to Brandy's husband, Thomas. Defendant spoke with Thomas about buying a shotgun for protection during a marijuana purchase. Thomas rolled a joint of marijuana, and the group smoked it. Defendant and Price were in the trailer at the same time for about fifteen minutes. Brandy did not see them talking.

Thomas McIntyre testified that he first met defendant at the trailer on 8 September 1992. He stated that defendant asked him if Price had a boyfriend, and Thomas told him she did. Thomas testified that he rolled a joint and that they all smoked it. He further stated that he never saw Price and defendant talking.

STATE v. CAMPBELL

[340 N.C. 612 (1995)]

Timothy Corriher testified that on the morning of 10 September 1992, a neighbor stopped at his house to tell him a car had burned near his property. Corriher drove down Lipe Road and found the car. He alerted the police. A trained arson investigator with the Rowan County Sheriff's Department testified that he examined the car and concluded that an accelerant was involved. He also determined that a license plate taken from the car had been issued in Price's name.

Tom Baker testified that on 11 September 1992 he discovered the body of Katherine Price in a field in the Mill Bridge area of Rowan County. An agent processed the field for evidence. The body was found face down about twenty-five or thirty feet off the dirt road underneath some low-hanging limbs of a clump of trees. Two pieces of plaid material were found in the immediate vicinity of the body. One piece consisted of two pieces knotted together.

SBI Agent Jedd Taub, a forensic serologist, testified that he had performed luminol testing on the blood in the field. In his opinion, the arc of blood deposition on the tree branches, leaves, and ground was consistent with multiple stab wounds to the neck. The pattern he observed could have been caused by blood being thrown off a knife as it was pulled back or brought forward.

Dr. Thomas Clark, a forensic pathologist, testified that Price had a combination of fifteen stab wounds and seven incised wounds to her neck; each was one-half to one-and-a-half inches deep. In addition, she had two wounds to her face, her left and right carotid arteries were cut, and one arterial stab had penetrated to her spine and caused profuse bleeding. Dr. Clark further testified that Price died of the stab wounds to her neck. Price could have lived a few minutes after the stabbing. Blood found in her vagina matched defendant's and hers. Because Price's neck was badly decomposed, Dr. Clark could not opine whether Price had been strangled.

Jeffrey Beaver, defendant's brother-in-law, testified that in early September 1992, defendant called him and asked to borrow his gun. Later, defendant came to Beaver's trailer, and they talked. Defendant cried and stated that he was in serious trouble. He stated that he had killed an innocent person two days before and that he could either run, go back to prison, or kill himself. He further told Beaver that he had to get rid of his knife and tennis shoes. Beaver had seen defendant with a red-handled butterfly knife at some point in the past. Beaver heard later that a woman had been killed. He called the police and gave them defendant's name.

STATE v. CAMPBELL

[340 N.C. 612 (1995)]

Tina Cline testified that she met defendant in May 1992 and began dating him. In August 1992 she became involved with someone else. On 6 September 1992 defendant learned that she was seeing another man, and he came to her house. Cline testified that defendant forced her into his car. He then forced her to drive to his camper and to a wooded area near the airport. Defendant then raped her. She did not report it to the police because she feared his reprisal if the charge was unsuccessful.

The next day defendant called her and told her he was going to commit suicide. He repeatedly asked if she was all right and said he knew he had hurt her. Cline told defendant that he needed help and that she was going to call the sheriff and have him committed.

The day defendant was arrested Cline received a call from the Sheriff's Department. An agent told her defendant was not going to confess to murder, kidnapping, and rape until she got there. Cline went to the Sheriff's Department. Defendant told her that he had killed an innocent girl and that it was Cline's fault because he would not have been looking for another woman if she had not left him.

On 16 September 1992 SBI Agent Bill Lane arrested defendant on the charge of murder. He advised defendant of his constitutional rights; defendant waived his right to counsel. Defendant told Lane that he would locate evidence for them and provide a complete statement but that he first needed to see Teresa Allman, a married woman with whom he was having a sexual relationship, and Tina Cline. He told Lane that Allman did not know about the murder. When Allman was brought to see him, he apologized to her for getting her involved.

Defendant told Agent Lane where several pieces of evidence were, including a red butterfly knife that, according to Dr. Clark's testimony, could have caused Price's wounds. He directed agents to a road near where Price's body was found and showed them where a shirt and belt were located.

After the evidence was gathered, defendant gave a lengthy, detailed confession to the murder. He indicated that he first saw Price the day before the murder when she was walking to the store. At the time he was looking for a gun because he wanted to kill his former girlfriend, Tina Cline. At 6:00 a.m. the day after he first saw Price, defendant walked to the store. A car went past him; Price was driving. She offered him a ride. As she drove, defendant placed a butterfly

knife to her throat. He knew the knife bothered her a lot. He forced her to drive to Airport Road.

When they arrived, he removed the knife and put it away. She offered to smoke marijuana with him. He directed her down a dirt road on the pretext of visiting a friend. She proceeded, despite the desolate nature of the surroundings. He assured her nothing would happen to her. She stopped near a big tree. Defendant continued to assure her. He threw the wrenches and screwdriver from her car and put away the knife. He determined that he would have to kill her because "he couldn't leave the girl there and he couldn't take her with him."

They made small talk, and defendant asked her to have sex with him. Price agreed, but defendant also stated, "you can call it rape." Defendant then sat on the hood of the car and smoked his remaining cigarettes. He raped her again and strangled her until his thumbs were numb. Price was moaning. He tried to strangle her with a piece of flannel shirt, but it tore. She continued to moan. Then he took her outside and put her on the ground. She was moaning. He took his knife and stabbed her throat. He stated, "I sat and watched the blood come out of her throat and she was still moaning and groaning." He stabbed her many more times because he wanted her to die, which she did. He then attempted to dispose of the evidence.

Defendant drove to the bowling alley the next night to see Teresa Allman. He and Allman drove to the place where he had left Price's car. He got out of the car and set Price's car on fire with gasoline he and Allman had obtained.

Defendant also drew and signed a sketch of the murder scene.

Teresa Allman testified that she and defendant began an intimate relationship in July 1992. She further testified that she was with defendant when he burned Price's car. When she visited defendant after his arrest, he told her he had killed an innocent girl and he was sorry.

Three women testified about prior crimes defendant had committed. Jean Killian testified that she had been kidnapped by defendant. Robin Sauls, who dated defendant, testified that defendant had raped her. Ada Teal testified that defendant had jumped in her car one day and directed her to a trailer park. He then directed her to a field and asked her to exit the car while he was holding a knife. She refused. They then drove several places. Ultimately defendant drove her to a

field and raped her. She reported it to police after defendant took her home. The day after defendant raped Teal, he called her and asked her to meet him. On advice from the police, she agreed to do so, but defendant was arrested in the interim.

Defendant presented the following evidence during the guilt phase:

Defendant testified that he had had consensual sex with Sauls. He also stated that, contrary to her testimony indicating that defendant had kidnapped her, Killian had agreed to give him a ride. He further testified that, contrary to Ada Teal's testimony, they had had consensual sex after she agreed to give him a ride.

Defendant testified that he and Allman had an intimate relationship. He indicated that on the Sunday before Price was killed, Allman returned from a trip out of town. They had planned to get together the next day and did so. They drove out to the Mill Bridge area in her car and went down the road that leads to the back of the fields. They had been there several times to have sex.

According to defendant, Price came to his camper shortly after 7:00 a.m. on 9 September 1992. They had met the day before at the McIntyres' trailer. Price told defendant she had a joint for him and asked if he would like to smoke it. They smoked and talked for about thirty minutes. Defendant asked Price if he could kiss her, and she nodded "yes." They then decided to spend the day together and drove out to the Mill Bridge area. Defendant testified that they had consensual sex there.

Defendant testified further that Teresa Allman drove up and got out of her car. She was angry and cursing. According to defendant, Allman stabbed Price and killed her.

During the sentencing phase, the State presented the following evidence:

Jennie Clayton testified that in June 1982, she was a secretary at Windsor Elementary School in Richland County, South Carolina. Defendant was in the school one day seeking directions. Clayton gave defendant directions, and while she was doing so, defendant placed a sharp object against her throat. He demanded the keys to her car. Clayton managed to get away. In November 1982 defendant was convicted of aggravated assault based on this attack.

Linda Shadel testified that defendant took her to a field, tied her to a tree, and left her. She managed to escape. Defendant was

arrested the next day. Some time later he called Shadel and asked her about her dog. He told her that he knew she did not want to press charges and that her husband had forced her to do so. In November 1982 defendant was convicted of housebreaking and grand larceny in connection with his crimes against Shadel.

The State also introduced evidence of defendant's conviction in January 1980 for the assault on Jean Killian.

During the sentencing phase defendant presented evidence that he came from a broken home, that his mother drank excessively, and that he began smoking marijuana when he was twelve or thirteen. Defendant testified that he had had a violent childhood. Defendant's employer testified that defendant was an excellent worker.

Dr. Bob Rollins, a forensic psychiatrist, testified that defendant suffered from mental disorders and that he was under the influence of these disorders at the time of the crime. The disorders impaired his ability to understand and conform to appropriate standards of behavior. Dr. Rollins also testified that defendant's marijuana use on the day of the crime would have impaired his ability to conform to appropriate standards of behavior.

## GUILT PHASE

[1] In his first assignment of error, defendant argues that the trial court committed reversible error by appointing Dr. Bob Rollins, a forensic psychiatrist, to assist him at trial because Dr. Rollins also had conducted a pretrial evaluation of defendant and had determined that defendant was competent to proceed. Defendant argues that because Dr. Rollins' diagnosis was of little benefit to him, he was denied his right to expert assistance.

When defendant made his motion for expert assistance, the court asked defense counsel why Dr. Rollins could not act as his expert. Defense counsel responded that because Dr. Rollins had handled the competency determination, it might be difficult for him to proceed further. The State argued that the need for someone else had not been established and that though Dr. Rollins worked for a state facility, he was not necessarily a prosecution witness. The trial court agreed and stated that it knew of no reason why a state psychiatrist could not be a defense witness. The trial court refused to appoint a new psychiatrist for defendant.

STATE v. CAMPBELL

[340 N.C. 612 (1995)]

Defense counsel sought Dr. Rollins' assistance. Dr. Rollins tried to talk with defendant, but defendant did not want to talk to him. Defendant then renewed his motion for expert assistance. The trial court stated that it could do nothing if defendant did not want to talk to Dr. Rollins. The court then stated that "there was no specific showing that a psychiatrist was needed to begin with for either the trial of the case or for any potential sentencing hearing." Defense counsel ultimately indicated to the court that defendant would cooperate with Dr. Rollins because the court refused to make another psychiatrist available to him.

Assuming *arguendo* that defendant made an adequate showing of a specific need for an expert, *see State v. Johnson,* 317 N.C. 193, 198-99, 344 S.E.2d 775, 778-79 (1986), our review of the record establishes that defendant received adequate assistance from Dr. Rollins in the presentation of mitigating evidence. At trial Dr. Rollins offered his opinions, which were based on four interviews with defendant, defendant's statement, investigative reports, reports of interviews with defendant's mother and sisters, and Dr. Rollins' interview with defendant's sister. Based on this information, Dr. Rollins testified that defendant had two types of mental disorders, one of personality and one of adjustment. He stated that defendant's ability to understand appropriate standards of behavior was affected by these disorders and was impaired further by his use of marijuana. He also indicated that defendant began using marijuana when he was eleven or twelve. He further testified that defendant's youth was characterized by poverty-related concerns for food, clothing, and shelter.

Dr. Rollins' testimony was the sole supporting evidence for the lone statutory mitigating circumstance found by one or more jurors: that the capital felony was committed while defendant was under the influence of a mental or emotional disturbance. It also supported two nonstatutory mitigating circumstances that were found by one or more jurors: "[Defendant] was and is emotionally neglected and has chronic feelings of deprivation, inadequacy and anger, and he is uncomfortable and frightened by these feelings"; and "[Defendant] has a history of substance abuse which began at a very early age as a consequence of a lack of supervision and a lack of family structure." We thus can perceive no prejudice resulting from the appointment of Dr. Rollins to assist defendant in his trial. This assignment of error is overruled.

STATE v. CAMPBELL

[340 N.C. 612 (1995)]

**[2]** In his second assignment of error, defendant argues that the trial court committed reversible error during jury selection by prohibiting defendant from asking questions of prospective jurors individually and by requiring questions to be posed to the entire group in the jury box. He notes that the trial court allowed individual questioning of prospective jurors only if a group question produced a response from some jurors.

The governing statute, N.C.G.S. § 15A-1214(c), provides:

> (c) The prosecutor and the defense counsel, or the defendant if not represented by counsel, may personally question prospective jurors individually concerning their fitness and competency to serve as jurors in the case to determine whether there is a basis for a challenge for cause or whether to exercise a peremptory challenge. The prosecution or defense is not foreclosed from asking a question merely because the court has previously asked the same or similar question.

N.C.G.S. § 15A-1214(c) (1988).

It is within the trial court's discretion to regulate the manner and extent of inquiries on *voir dire. State v. Young*, 287 N.C. 377, 387, 214 S.E.2d 763, 771 (1975), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976). This Court consistently has held that N.C.G.S. § 15A-1214(c) does not preempt the exercise of the court's discretion during jury selection. *State v. Allen*, 322 N.C. 176, 189-90, 367 S.E.2d 626, 633 (1988); *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980). It remains the court's prerogative to expedite jury selection by requiring general questions to be posed to the whole panel.

A trial court's discretionary ruling may be reversed for an abuse of discretion only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision. *State v. Barts*, 316 N.C. 666, 682, 343 S.E.2d 828, 839 (1986). Defendant does not argue that the court abused its discretion in conducting jury selection in this manner. Defendant did not object to the procedure, and nothing suggests that the court restricted defendant's ability to examine each prospective juror individually. Our review of the record reveals that defendant was allowed to question jurors individually at several points during jury selection even if the initial question to the group failed to produce a response. Further, the jurors responded individually to group questions if the questions required an individualized response based on their personal situations. We conclude that the

trial court did not abuse its discretion in controlling jury selection in this manner. *See Allen*, 322 N.C. at 190, 367 S.E.2d at 634. This assignment of error is overruled.

**[3]** Defendant next assigns as error two comments by the court to the jury. He contends that through these comments, the trial court expressed its opinion about the case. The first comment occurred at the end of the second week of the presentation of evidence. Defendant had been on the stand for two and one-half days and had been the only witness to testify during that period. The court interrupted defense counsel's questioning of defendant as follows:

THE COURT: Excuse me, Mr. Davis. I think I've tested the jury's attention span for today.

DEFENSE COUNSEL: Yes, sir.

THE COURT: I'm going to call it off. You may step down, Mr. Campbell.

Defendant contends that the court's comment about testing the jury's attention span communicated to the jury that the court thought defendant's testimony, out of all the other evidence the jury had heard, was a test of the jury's and the court's attention spans and thus worthy of less attention than other testimony.

N.C.G.S. § 15A-1222 provides that a court "may not express[,] during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1988). Defendant, however, must show that he was prejudiced by the court's remark in order to receive a new trial. *State v. Howard*, 320 N.C. 718, 723, 360 S.E.2d 790, 793 (1987). The comment by the court was not an expression of opinion. The court stated that it, not defendant, had tested the jury's attention span. The court was simply referring to its responsibility to manage the trial. We cannot conclude that this could properly be characterized as an expression of opinion.

Defendant also complains about the following comment by the court, which occurred after the State's final argument in the guilt phase:

All right. Now, ladies and gentlemen of the jury, you've heard all the evidence. You have heard the arguments of counsel. Tomorrow at nine o'clock, or very shortly thereafter, I'll give you the law that pertains to this particular sad situation.

**STATE v. CAMPBELL**

[340 N.C. 612 (1995)]

Defendant contends that this comment was inappropriate because it conveyed the court's evaluation of the case and placed pressure on the jury to render a verdict vindicating the "sad situation."

Again, we do not consider this an expression of opinion by the trial court. Defendant did not allege self-defense or justifiable homicide but claimed that someone else committed the murder. The court's characterization of the situation as "sad" would appear to be a universal sentiment regarding a murder. We conclude that both comments were innocuous and were not prohibited expressions of opinion by the trial court. N.C.G.S. § 15A-1222 therefore was not violated. This assignment of error is overruled.

[4] In his next assignment of error, defendant argues that the prosecution's closing arguments during the guilt phase introduced irrelevant considerations into the fact-finding process; consequently, there is reason to fear that "substantial unreliability" and "bias in favor of death" resulted. *Caldwell v. Mississippi*, 472 U.S. 320, 330, 86 L. Ed. 2d 231, 240 (1985). Defendant did not object to any of the four arguments about which he now complains. Nonetheless, he contends that the trial court should have intervened *ex mero motu*.

First, defendant points to the prosecution's argument that defense counsel had "violated" State's witness Ada Teal during the cross-examination. Specifically, the prosecutor stated:

Ada Teal testified. You could see in every fiber of her being what she had been through. You could see it. She shook. She cried. At times her body was racked with sobs. She still feels the terror that she went through. James Campbell kidnapped her. He raped her. He terrorized her, and then in this courtroom one more time she was violated by Mr. Locklear, who said, "You invited him into your car. You consented. Your husband doesn't believe you." Oh, really? Why don't you bring him in here? Why don't you bring in Packard Teal if there's any basis to that? "You enjoyed it. You just said this because your husband was mad, and you're divorced now, aren't you?" It was outrageous, reprehensible. No wonder our women don't report rape. No wonder they say, "I can't go through with this. I can't do that." Did Ada Teal get justice in this courtroom? You folks will decide what she went through as you assess all the evidence in this case. But the purpose of her testimony and the purpose of Jean Killian's testimony was for you to decide what happened to Katherine Price. Did James Adolph Campbell do it, and did she consent?

Defendant contends the prosecutor was punishing him for having his counsel cross-examine a State's witness and that the prosecutor blamed defendant and his counsel for the reluctance of unknown rape victims to prosecute their attackers. Further, the jury was invited to convict defendant on the issue of whether Teal received justice during the trial. Defendant maintains that the argument was not supported by the evidence or the relevant law. We disagree.

Because defendant failed to object to this argument, he must show that it was so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. We have stated that " 'the impropriety . . . must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.' " *State v. Price*, 326 N.C. 56, 84, 388 S.E.2d 84, 100 (quoting *State v. Artis*, 325 N.C. 278, 323, 384 S.E.2d 470, 496 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991)), *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated on other grounds*, — U.S. —, 122 L. Ed. 2d 113, *on remand*, 334 N.C. 615, 433 S.E.2d 746 (1993), *sentence vacated on other grounds*, — U.S. —, 129 L. Ed. 2d 888, *on remand*, 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied*, — U.S. —, 131 L. Ed. 2d 224, *reh'g denied*, — U.S. —, 131 L. Ed. 2d 879 (1995).

Defendant's prior crimes were introduced to show a pattern of behavior. The credibility of Teal therefore was important. Defendant claimed that he did not kidnap and rape Teal but that the encounter was consensual. It is not improper for the prosecutor to refer to the demeanor of a witness during the ordeal of testifying as evidence of her truthfulness. *State v. Cummings*, 323 N.C. 181, 192, 372 S.E.2d 541, 549 (1988) (prosecutor may argue to the jury about the demeanor of a witness, a matter which is before it), *sentence vacated*, 494 U.S. 1021, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 249, 404 S.E.2d 849 (1991). Further, the prosecutor emphasized that the purpose of Teal's testimony was to aid the jury in determining what happened to Price, the victim here, not to bring justice to Teal. This argument thus did not require *ex mero motu* intervention.

[5] In this same assignment of error, defendant argues that the second prosecutor conveyed his opinion to the jury that defendant's case warranted full prosecution. The prosecutor argued:

Briar [sic] Rabbit was going back to the briar patch, back to the place that he knew the probation violations, parole violations would get him. But you know what? No plea bargain. No deal, no prison time, the State is seeking a penalty of death. The plan went awry. . . . Prison doesn't scare him. He gives a statement because what is his experience with the court system? Plea bargain, charges—charges dropped. And I might add that neither Ms. Symons or I were either one prosecuting in this county when those charges [against defendant] were dropped. . . . But that's not happening in this case.

We cannot say that the prosecutor's statement that he was not in charge of defendant's prior cases when the charges were dropped was so grossly improper as to require the court to intervene *ex mero motu.* Even assuming *arguendo* that the argument was improper, we conclude that it could not have been prejudicial given the evidence against defendant, including his own pretrial confession. It is unlikely that this one statement impacted the jury's verdict. Further, the overall thrust of this argument was to point out why defendant gave a confession that he later contradicted in his trial testimony. The prosecutor conveyed the idea that defendant was not accustomed to being tried capitally because of the system's reaction to his prior crimes; because he did not expect that course of action, he felt free to tell the truth in his pretrial statement.

[6] Defendant also contends that the prosecutor improperly argued deterrence to the jury. Defendant failed to object to this argument. The prosecutor argued:

There's going to be time in the morning after [you are] instructed by the Court to do your duty. As I stated, it's been a long trial, and I'm sorry, frankly, that I have talked as long as I have. But it is important to the State of North Carolina, and it is important to the Kathy Prices of the future that you do your duty, and you find him guilty of everything he's charged with. Thank you.

We have held that specific deterrence arguments suggesting that the defendant should be convicted so that he cannot kill again are not improper. *See State v. Abraham,* 338 N.C. 315, 339, 451 S.E.2d 131, 143 (1994); *State v. Zuniga,* 320 N.C. 233, 268-69, 357 S.E.2d 898, 920-21, *cert. denied,* 484 U.S. 959, 98 L. Ed. 2d 384 (1987). Here, the prosecutor argued that the jury should convict defendant so he could not commit crimes in the future. There was nothing improper in this argu-

STATE v. CAMPBELL

[340 N.C. 612 (1995)]

ment; thus, *ex mero motu* intervention was not required. This assignment of error is overruled.

SENTENCING PHASE

[7] Defendant next assigns as error the court's response to the jury's written questions submitted during sentencing deliberations. The jury asked several questions, including, "Life sentence, what is minimum time? What is least time served? Could he be released early because of our over-crowded prisons? And what about good behavior?" In response to these questions, the court stated:

Now, . . . I'm just going to say this. This is just not of your concern. You're to take the instructions that I gave you in this case, and you're not to concern yourself with anything else. That's not— that's just not for your concern. All right, take charge of the jury.

Defendant argues that the court should have included in the instruction the statement that "life means life."

Defendant concedes that he did not request the instruction but argues that its omission was plain error. We disagree. A defendant's eligibility for parole is not a proper matter for consideration by a jury. *State v. Brown*, 306 N.C. 151, 182, 293 S.E.2d 569, 589, *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982). As defendant suggests, we have approved the inclusion of the language "life means life" in response to such inquiries; however, we have not required it. *Compare State v. Lee*, 335 N.C. 244, 266-67, 439 S.E.2d 547, 557-58, *cert. denied*, — U.S. —, 130 L. Ed. 2d 162, *reh'g denied*, — U.S. —, 130 L. Ed. 2d 532 (1994) *with Brown*, 306 N.C. at 181-82, 293 S.E.2d at 588-89. Here, the court told the jury what was required: that it was not to consider parole in its deliberations. The trial court does not have to instruct the jury in the precise words the defendant requests. *Brown*, 306 N.C. at 182, 293 S.E.2d at 589. We assume that the jury followed the court's instructions and did not consider the possibility of parole in its deliberations. *Lee*, 335 N.C. at 266-67, 439 S.E.2d at 558. The response did not constitute plain error. This assignment of error is overruled.

[8] In another assignment of error, defendant argues that the trial court mishandled the inquiries it made of the jury following a failed escape attempt by defendant out of the presence of the jury. Because of this alleged mishandling, defendant asserts that his Sixth Amendment right to an impartial jury was violated.

**STATE v. CAMPBELL**

[340 N.C. 612 (1995)]

During a recess defendant and his attorneys met in an unused jury room located next to the one in which defendant's jury met. According to *voir·dire* testimony, defendant and one of his attorneys were alone in the unused room. Juror Mary Johnston and a bailiff were in the room next door. Defendant broke a window pane and went onto the ledge outside the room in an attempt to escape. The bailiff heard the noise, looked out the window, and saw the broken glass. The bailiff instructed Johnston to remain inside. He then went to the room next door. A sheriff's deputy retrieved defendant from outside the window, while another held his weapon on defendant.

The court conducted an inquiry of Johnston outside the presence of the jury as follows:

THE COURT: Ms. Johnston, it has become necessary to bring you in because during the recess, a matter has occurred. And unbeknownst to this Court, you were in the jury room. And I just happen to have to know at this time what if anything that you know to make sure that you can still be a fair and impartial juror.

JOHNSTON: I don't know anything except that I saw glass through a window. And nothing was said to me about anything except that I was not to leave the room.

THE COURT: All right. Do you know of anything at this time that you've seen or heard that would prevent you from being a fair and impartial juror during this sentencing hearing?

JOHNSTON: No.

The court then sent Johnston back to the jury room. After some discussion with defense counsel and the prosecutors, the court brought Johnston back in and instructed her not to discuss its inquiry or to consider it during deliberations. She stated that she would comply. Defendant did not ask that she be removed.

After a recess following the *voir dire* of Johnston, defense counsel informed the court that jurors Morgan and Lingle might have observed the attempted escape. The court asked defendant if he knew whether the two jurors had seen him. Defendant replied, "I seen them at the moment. I can't say they honestly seen me a good bit. But I don't really know." The court then brought in Morgan and Lingle individually and conducted a *voir dire*. Morgan indicated that he had observed broken glass and that it would not impact his deliberations. Lingle stated that he had seen a repairman working on the window.

The court then reunited the jury and asked if it had made any observations that could prevent a decision based solely on the evidence. The jury indicated that it could go by the evidence; the presentation of evidence then proceeded.

Defendant complains because the court never determined what Johnston understood had happened in the room next door, where she knew defendant was when the glass broke. He contends that her responses to the court's inquiries regarding her ability to be fair were not illuminating because it was not clear what she thought had happened. Further, defendant argues the court should have instructed her to keep what she had seen to herself. Thus, according to defendant, she could have told the other jurors what she had seen and what she thought had happened without discussing the court's inquiry of her.

Defendant also contends the court failed to make a thorough inquiry of Morgan and Lingle. It did not ask them what they thought had happened, nor did it determine whether the two jurors had already discussed the matter with the other jurors.

We have stated that "[w]hen there is a substantial reason to fear that the jury has become aware of improper and prejudicial matters, the trial court must question the jury as to whether such exposure has occurred and, if so, whether the exposure was prejudicial." *Barts*, 316 N.C. at 683, 343 S.E.2d at 839. The trial court made a proper, individual inquiry of the three jurors. From their *voir dires* it is apparent that all three were aware only of a broken window, a circumstance which does not readily suggest that defendant attempted to escape. Johnston, Morgan, and Lingle each told the court nothing had occurred that would impair their ability to be fair and impartial jurors. Further, the entire jury indicated that it could be fair and impartial. We conclude that the trial court correctly determined that the three jurors' exposure to the sound and sight of a broken window was not prejudicial and that the entire jury could be fair and impartial. This assignment of error is overruled.

[9] In his next assignment of error, defendant contends the trial court erred by failing to intervene *ex mero motu* on five occasions during the State's closing arguments. He argues that the comments were grossly improper and that the trial court abused its discretion by not taking corrective action even absent objections by defendant. We disagree.

Defendant first points to a statement that he interprets as suggesting to the jury that it was obligated to return a sentence of death because the community expected it. The prosecutor argued:

> Now, for the crime that he committed against Katherine Price, a crime so horrendous, and for his prior crimes, so reprehensible, justice can be done with only one verdict, one punishment, death. This crime and this man call out for that. And our society and our community call out for that. It is the only appropriate punishment in this case. How will you come to decide what is the appropriate punishment? You will follow the law.

Defendant cites our decision in *State v. Scott*, 314 N.C. 309, 333 S.E.2d 296 (1985).

Defendant's reliance on *Scott* is misplaced. There, the prosecutor argued: "[T]here's a lot of public sentiment at this point against drinking and driving, causing accidents on the highway." *Scott*, 314 N.C. at 311, 333 S.E.2d at 297. We held this argument improper because it went outside the record and focused on public sentiment against drinking and driving and the accidents caused thereby, suggesting to the jury that it should convict the defendant based on other accidents caused by drunk drivers. *Id.* at 312, 333 S.E.2d at 298.

Here, in contrast, the prosecutor merely stated that the law is in accord with the community's view of the appropriate punishment and that the jury should follow the law in reaching its recommendation. We have held such arguments to be permissible. *See State v. Soyars*, 332 N.C. 47, 59-61, 418 S.E.2d 480, 487-88 (1992) ("You come here and represent the conscious [sic] of the community."); *State v. Artis*, 325 N.C. 278, 329-30, 384 S.E.2d 470, 499 ("When you hear of such acts . . . you think, 'Well, somebody ought to do something about that.' . . . You are the somebody. . . . You speak for Robeson County . . . ."); *State v. Huff*, 325 N.C. 1, 71, 381 S.E.2d 635, 676 (1989) ("Today, you speak for the people of North Carolina. You are the moral conscience of our community."), *sentence vacated*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), *on remand*, 328 N.C. 532, 402 S.E.2d 577 (1991). We conclude there was nothing improper in this argument.

[10] Next, defendant argues that the prosecutor's argument that defendant had enjoyed the killing was not based on evidence and was extremely inflammatory. In discussing the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, the prosecutor argued:

Imagine the fear, the emotions of Katherine Price when you're considering whether this was designed to reflect a high degree of pain, maybe even for the enjoyment of it. The enjoyment of it. The James Campbell [sic] loves to have women in his power and to toy with them. You know why? After he's done, he calls them back. He calls them back.

Defendant cites other examples where the prosecutor referred to defendant's enjoyment of the murder. He contends that because evidence of defendant's remorse was presented, this argument was improper as not based on the evidence. We disagree.

Counsel for both sides may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom. *State v. Huffstetler*, 312 N.C. 92, 112, 322 S.E.2d 110, 123 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). There was evidence to support the prosecutor's argument, such as the evidence of defendant's contact with two of his kidnapping victims, Ada Teal and Linda Shadel, after the crimes. Tina Cline testified that the day after defendant raped her, he called to apologize and to ask if she was all right. The prosecutor was drawing a reasonable inference from this evidence when he argued that defendant enjoyed the power over his victims that he derived from the commission of a crime against them.

Further, there was evidence that there was no animosity between defendant and Price prior to the attack, that defendant spontaneously and without reason decided to kill Price, that he brutally strangled her and then stabbed her multiple times, and that the injuries were much greater than necessary to incapacitate her. Defendant's pretrial statement indicated that Price moaned and was rendered helpless after he initially failed to kill her. *See State v. Laws*, 325 N.C. 81, 106, 381 S.E.2d 609, 624 (1989) (argument that the defendant loved killing was permissible inference based on evidence of brutality of murder, lack of provocation by victim, and lack of animosity between the defendant and the victim), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, 502 U.S. 876, 116 L. Ed. 2d 174, *reh'g denied*, 502 U.S. 1001, 116 L. Ed. 2d 640 (1991); *Zuniga*, 320 N.C. at 256, 357 S.E.2d at 913 (prosecutor's argument that the defendant enjoyed murdering the victim held permissible based on evidence that the defendant stabbed the victim in the neck after raping her). The prosecutor's argument was therefore based on the evidence and was not improper.

STATE v. CAMPBELL

[340 N.C. 612 (1995)]

**[11]** Defendant also points to an argument that, according to defendant, emphasized the suffering of the victims of defendant's prior misconduct. The prosecutor argued:

> This is deserving of a tremendous amount of weight, this kind of recidivist history again and again and again. And they're not just labels and convictions. They represent women who were victimized at the time and are still victimized today.

The aggravating circumstance of prior convictions for crimes involving the use or threat of violence against a person was submitted to the jury. The prosecutor may argue that defendant's criminal history deserves great weight in support of that circumstance. *See State v. Green*, 336 N.C. 142, 186-87, 443 S.E.2d 14, 40 (finding no impropriety in similar jury argument directed to weight to be given to "course of conduct" aggravating circumstance), *cert. denied*, — U.S.—, 130 L. Ed. 2d 547 (1994). This argument was proper.

**[12]** Defendant also complains because, he argues, the prosecutor stated that defendant was not a human being. The prosecutor argued:

> Famous man once said, all that walks in the eyes of a man is not necessarily a human. That applies here. James Campbell is a man who has the reaper of death tattooed on his forearm, who has terrorized women in North and South Carolina, put in fear of their lives. And he killed Katherine Price.

Later, the second prosecutor argued:

> Ladies and gentlemen, as I've watched old movies, and as I'm sure some of you have, I can remember where the cowboy movies, the bad guy always wore the black hat. I can remember in the old monster movies where the monster had fangs or he had pointy ears or he changed in some physical way when he went from being a normal person to being the werewolf or whatever—whatever transformation occurred.

> We all know because we're adults that there is no physical transformation that people go through. The way we identify a monster is to look at what did he do. What has he done before and what's his reaction to it? And that's what we've tried to present to you in this trial. What he did and what he stands before you convicted of is first-degree murder.

Defendant argues that these statements were grossly improper because this Court has disapproved arguments that likened defend-

ants to animals. *See State v. Hamlet*, 312 N.C. 162, 173, 321 S.E.2d 837, 845 (1984); *State v. Smith*, 279 N.C. 163, 165-66, 181 S.E.2d 458, 459-60 (1971).

We perceive no impropriety in these arguments requiring *ex mero motu* intervention. The prosecutors did not directly call defendant an animal; rather, they characterized defendant's depravity as a void in his character. They pointed out to the jury that defendant's normal appearance did not necessarily indicate a man of compassion and morality. The character of a defendant is an appropriate consideration during sentencing. *See State v. Oliver*, 309 N.C. 326, 360, 307 S.E.2d 304, 326 (1983) (emphasis in sentencing is on the circumstances of the crime and the character of the criminal).

**[13]** Defendant also argues that the following comments by the prosecutor were designed to denigrate the credibility of defendant's attorneys as well as defendant:

> The rules say at this stage of the punishment phase, that the defendant gets the last argument and gets as many arguments and for whatever length that they choose to make them. I fully anticipate that just as Mr. Campbell has been elbowing his lawyers through this entire trial, that after each of them concludes their remarks, he will be elbowing them again, and they will be coming back, and they will be coming back, and they will be coming back.

He interprets this argument as simultaneously punishing him for having consulted with his counsel during the trial and punishing his counsel in advance for making arguments that would attempt to convince the jury that a life sentence was the appropriate punishment.

We do not view this argument as implicating defendant's right to counsel. Immediately prior to this statement by the prosecutor, defendant's attorney had addressed the jury very briefly. The prosecutor told the jury not to get excited about the brevity of defendant's argument. He then made the complained-of statement and immediately stated:

> I don't know how long it will last. But I can tell you this, when I conclude what I'm saying to you right now, this is going to be the last words you're going to hear from the State of North Carolina in the case of the State of North Carolina versus James Adolph Campbell. We're not going to make any third argument or any fourth argument, this is it. I don't know how long they will go on. But I ask you to give us your attention for a little bit longer.

Rather than denigrating defendant and his counsel, the prosecutor was preparing the jurors for the anticipated lengthy closing arguments. He asked them for their attention and patience. We cannot say the prosecutor's comment was so grossly improper as to require *ex mero motu* intervention. This assignment of error is overruled.

[14] In his next assignment of error, defendant argues that the trial court erred by failing to instruct the jury that it could not consider the same evidence as supportive of more than one aggravating circumstance. Defendant failed to request an instruction but contends that the court committed plain error by not giving one *ex mero motu*. Defendant focuses on the prosecutor's closing arguments which pointed to defendant's kidnapping and raping of Price as supportive of both the aggravating circumstance that the murder was committed during the commission of a rape and/or kidnapping and the circumstance that the murder was especially heinous, atrocious, or cruel. The prosecutor also argued evidence of prior convictions for violent felonies in support of the circumstances that the murder was especially heinous, atrocious, or cruel and that it was committed to avoid a lawful arrest. Defendant posits that the probable duplicative use of the evidence allowed the jurors to give more weight to the circumstances than they otherwise would have, thereby influencing their sentencing recommendation.

Defendant further argues that the court's instructions compounded the problem in that they allowed the jury to use the same evidence to support more than one circumstance. The court charged:

> All evidence relevant to your recommendation has been presented. There is no requirement to resubmit during the sentencing proceeding any evidence which was submitted during the guilt phase of the case. *All the evidence which you hear in both phases of the case is competent for your consideration in recommending punishment. It is now your duty to decide from all the evidence presented in both phases what the facts are.*

(Emphasis added.)

The trial court submitted four aggravating circumstances, and the jury found all four. Defendant concedes that "the aggravating circumstances in this case all could have been properly considered under this Court's precedents without double-counting of evidence." We therefore need only to determine whether the trial court should have instructed the jury so as to prevent the possible duplicative use of the evidence.

We stated in *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993), that "the trial court should . . . instruct the jury in such a way as to ensure that jurors will not use the same evidence to find more than one aggravating circumstance." Defendant failed to request an instruction; therefore, our review is for plain error. Defendant must show that the error was so fundamental that it had a probable impact on the result reached by the jury. *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 378-79 (1983).

We cannot say that this was plain error. This murder was particularly savage. Price was stabbed many times and, according to Dr. Clark, could have lived for a time after the wounds were inflicted. Further, there was separate evidence to support each aggravating circumstance. The court's instruction that defendant contends compounded the problem was likely interpreted by the jurors as permission to consider both guilt and sentencing phase evidence in their deliberations rather than as license to use the same evidence to support more than one circumstance. We think it unlikely that the trial court's failure to instruct *ex mero motu* on the duplicative use of evidence had a probable effect on the sentencing recommendation. This assignment of error is overruled.

[15] In his next assignment of error, defendant argues that the trial court violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing to inform the jury that if defendant were sentenced to life and received consecutive life sentences, he would never be paroled given his reasonably expected life span. Defendant notes that the prosecutor argued to the jury about defendant's future dangerousness. He therefore contends that his case is like that of *Simmons v. South Carolina*, — U.S. —, 129 L. Ed. 2d 133 (1994). Defendant failed to request a parole instruction; however, he argues that the failure to so instruct was plain error. We disagree.

Unlike the defendant in *Simmons*, defendant here could not have been sentenced to life without parole. Under the statutes in effect when the murder was committed, had defendant received life he would have been eligible for parole after serving twenty years in prison. N.C.G.S. §§ 14-1.1(a)(1) (1993), 15A-1371(a1) (1988). An instruction that defendant would be ineligible for parole if he received life therefore would have been an incorrect statement of the applicable law. We have interpreted *Simmons* to apply only to cases wherein the alternative to a sentence of death is life imprisonment

**STATE v. CAMPBELL**

[340 N.C. 612 (1995)]

without the possibility of parole. *See, e.g., State v. Conaway,* 339 N.C. 487, 520, 453 S.E.2d 824, 845, *reconsideration denied,* 339 N.C. 740, 457 S.E.2d 304 (1995). Further, we have held repeatedly that parole eligibility does not reveal anything about the defendant's character or record or any circumstance of the offense; therefore, it is irrelevant to the sentencing process. *See, e.g., id.* We adhere to our prior rulings on this issue. We conclude that the failure to instruct the jury on parole eligibility was not error, much less plain error. This assignment of error is overruled.

**[16-21]** Defendant raises seven additional issues that he concedes this Court has decided against his position: (1) the trial court erred in denying defendant the right to examine each juror challenged by the State during death qualification prior to his or her excusal and by excusing jurors whom defendant was not permitted to question; (2) the trial court erred by denying defendant's motions to quash the murder and rape indictments; (3) the trial court erred by instructing the jury that all evidence in both phases of the trial was competent for the jurors' consideration; (4) the trial court erred by submitting to the jury the "especially heinous, atrocious, or cruel" aggravating circumstance with instructions that failed adequately to limit the application of the circumstance; (5) the trial court erred in its instructions on the burden of proof applicable to mitigating circumstances through use of the terms "satisfaction" and "satisfy" as defining the burden of proof; (6) the trial court erred in its instructions on mitigating circumstances because it allowed the jury to reject a mitigating circumstance on the basis that it had no mitigating value; and (7) the trial court erred in its use of the term "may" in sentencing recommendation issues three and four because this gave the jury discretion in considering proven mitigating circumstances. We find no compelling reason to depart from our prior holdings on these issues. These assignments of error are overruled.

We note that defendant made 157 assignments of error and has brought forward thirty-three of these under seventeen "questions presented." We deem the remaining assignments abandoned. N.C. R. App. P. 28(a), (b)(5).

PROPORTIONALITY REVIEW

**[22]** Having found no error in the guilt and sentencing phases, we must determine: (1) whether the record supports the jury's findings of the aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the jury imposed the sen-

tence of death under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (Supp. 1994).

The jury found defendant guilty of first-degree murder under the felony murder rule and on the basis of malice, premeditation, and deliberation. The jury also convicted him of robbery with a dangerous weapon, two counts of first-degree rape, burning of personal property, and first-degree kidnapping. At the sentencing proceeding, the trial court submitted the following aggravating circumstances: that defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); that the murder was committed for the purpose of avoiding or preventing a lawful arrest, *id.*(e)(4); that the murder was committed while defendant was engaged in the commission of rape and/or kidnapping, *id.*(e)(5); and that the murder was especially heinous, atrocious, or cruel, *id.*(e)(9). The jury found all four aggravating circumstances and found that the felonies of which defendant had been previously convicted were assault with intent to kill, robbery, aggravated assault and battery, housebreaking, and grand larceny. We hold that the evidence fully supports the aggravating circumstances. Our review of the record reveals nothing suggesting that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore begin our final statutory duty of proportionality review.

The trial court submitted two statutory mitigating circumstances: that the murder was committed while defendant was under the influence of mental or emotional disturbance and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired at the time of the offense. N.C.G.S. § 15A-2000(f)(2), (6). One or more jurors found the former to exist, but none found the latter. The trial court also submitted eleven nonstatutory mitigating circumstances, of which one or more jurors found two to exist: that defendant was and is emotionally neglected and has chronic feelings of deprivation, inadequacy, and anger, and he is uncomfortable and frightened by these feelings; and that defendant has a history of substance abuse which began at a very early age as a consequence of a lack of supervision and a lack of family structure. After weighing the aggravating and mitigating circumstances, the jury recommended a sentence of death.

This crime is distinguished by the brutal attack on the victim, which consisted of attempted strangulation and multiple stab wounds to her face and neck; the rape of the victim, which occurred prior to her death; and the kidnapping of the victim. Defendant was found guilty of murder based on both the felony murder rule and on malice, premeditation, and deliberation. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *Artis*, 325 N.C. at 341, 384 S.E.2d at 506. The jury found all submitted aggravating circumstances and found only three of thirteen mitigating circumstances submitted. It is also significant that the jury found that defendant is a recidivist whose prior convictions were for violent felonies.

We decline to engage in a detailed comparison of this case to the seven cases in which this Court has found the death penalty disproportionate. *See State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). This case is sufficiently distinguishable from those cases based on the jury's finding here of four aggravating circumstances, including that of the murder being committed during the commission of a rape and kidnapping. We have never found a death sentence disproportionate where the victim was sexually assaulted. *Lee*, 335 N.C. at 294, 439 S.E.2d at 574.

Our review of the pool reveals no case in which the jury found the four aggravating circumstances found here. However, there are fourteen capitally tried cases wherein the jury found three of these: that the defendant had a prior conviction of a violent felony; that the murder was committed while the defendant was engaged in a homicide, rape, robbery, or kidnapping; and that the murder was especially heinous, atrocious, or cruel. Of those fourteen cases, five defendants are to receive either a new trial or a new sentencing proceeding, which eliminates those cases from the pool. *See State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —- U.S. ——, 130 L. Ed. 2d 1083 (1995). Of the remaining nine, five defendants received life sentences; the other four received death sentences. Based on these statistics, we cannot say that juries consistently have returned life sentences in cases similar to defendant's. Further, in four of those cases wherein the defendant received a life sentence,

the defendant had not raped the victim, unlike here. As we have noted, juries tend to return death sentences in murder cases involving a sexual assault on the victim. *Lee*, 335 N.C. at 294, 439 S.E.2d at 574. In the fifth, *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980), the defendant was not convicted of first-degree kidnapping, unlike here.

We are not limited to matching the aggravating and mitigating circumstances of this case with cases in the pool. We instead must examine "the individual defendant and the nature of the crime or crimes which he has committed," *State v. Pinch*, 306 N.C. 1, 36, 292 S.E.2d 203, 229, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled in part on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988) and by *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), in conjunction with comparable cases. Several such comparable cases exist in which the death sentence was affirmed. Among them are: *State v. Moseley*, 338 N.C. 1, 449 S.E.2d 412 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 738 (1995); *State v. Sexton*, 336 N.C. 321, 444 S.E.2d 879, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 429 (1994); and *State v. Rose*, 335 N.C. 301, 439 S.E.2d 518, *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 883 (1994).

In *Moseley* the defendant savagely beat the victim with a blunt-force object, cut her with a sharp object, sexually assaulted her with a blunt instrument, raped her, and manually and ligaturally strangled her. *Moseley*, 338 N.C. at 15, 449 S.E.2d at 421. The jury found defendant guilty of first-degree murder based on premeditation and deliberation, first-degree sexual assault, and first-degree rape. It found the following six aggravating circumstances: that the defendant had been previously convicted of a felony involving the use or threat of violence to the person; that the defendant had been previously convicted of the felony of attempted second-degree sexual offense; that the murder was committed while the defendant was engaged in the commission of a first-degree sexual offense; that the murder was committed while the defendant was engaged in the commission of a first-degree rape; that the murder was especially heinous, atrocious, or cruel; and that the murder was part of a course of conduct in which the defendant engaged in the commission of other crimes of violence against another person or persons. *Id.* at 58-59, 449 S.E.2d at 446-47. The jury found two of the eight submitted nonstatutory mitigating circumstances: that the defendant was considerate and loving to his mother, father, and sister; and that the defendant was cooperative

**STATE v. CAMPBELL**

[340 N.C. 612 (1995)]

with law enforcement officers in not resisting arrest and in voluntarily assisting in the search of his bedroom at his parents' house. *Id.* at 62, 449 S.E.2d at 447-49.

In *Sexton* the defendant was convicted of first-degree murder based on both the felony murder rule and premeditation and deliberation. The defendant raped the victim and then strangled her. The victim may not have died immediately. Her body was badly bruised. *Sexton*, 336 N.C. at 337-38, 444 S.E.2d at 888. The jury found three aggravating circumstances, all of which also were found in this case: that the murder was committed while defendant was engaged in the commission of a first-degree rape, first-degree sexual offense, first-degree kidnapping, and common-law robbery; that the murder was especially heinous, atrocious, or cruel; and that the murder was committed for the purpose of avoiding or preventing a lawful arrest. The jury found eighteen of the twenty-seven nonstatutory mitigating circumstances submitted. *Id.* at 377-78, 444 S.E.2d at 911.

In *Rose* the victim died from both sharp and blunt-force trauma to the head and from manual strangulation. The defendant inflicted several incised wounds on the victim's body prior to her death. The defendant burned the body after death. *Rose*, 335 N.C. at 315-16, 439 S.E.2d at 525. The jury found two aggravating circumstances: that the defendant had been previously convicted of a felony involving the use or threat of violence to the person and that the murder was especially heinous, atrocious, or cruel. The jury found the nine nonstatutory mitigating circumstances but none of the statutory mitigating circumstances that were submitted. *Id.* at 349, 439 S.E.2d at 544.

As in *Moseley*, *Sexton*, and *Rose*, there was evidence here that Price could have lived for a period of time after the initial attack by defendant. Price, like the victims in those cases, was raped. Unlike the victims in *Moseley* and *Rose*, Price also was kidnapped by defendant. The jury here found the aggravating circumstances found in those cases, including that the murder was especially heinous, atrocious, or cruel and that defendant had prior convictions of violent felonies. We note that the aggravating circumstances that the murder was especially heinous, atrocious, or cruel and that the defendant had been previously convicted of a felony involving the use of violence are present in many death-affirmed cases. *Moseley*, 338 N.C. at 64, 449 S.E.2d at 449. Finally, defendant's jury found fewer mitigating circumstances than did those in *Sexton* and *Rose*.

Based on these cases, as well as our review of the pool, we conclude as a matter of law that the death sentence in this case was not excessive or disproportionate, considering both the crime and the defendant. We hold that defendant received a fair trial and sentencing proceeding, free of prejudicial error.

NO ERROR.